STATE OF CONNECTICUT *v.* RICARDO PEREIRA
(AC 21857)

Foti, Mihalakos and Flynn, Js.

Argued November 27, 2001—officially released September 24, 2002

*James B. Streeto*, deputy assistant public defender, for the appellant (defendant).

*Robert M. Spector*, assistant state's attorney, with whom, on the brief, were *Scott J. Murphy*, state's attorney, and *Brian Preleski*, assistant state's attorney, for the appellee (state).

*Opinion*

FLYNN, J. The defendant, Ricardo Pereira, appeals from a judgment of conviction after a jury trial for murder and kidnapping in the first degree in violation

of General Statutes §§ 53a-54a (a)[1] and 53a-92 (a) (2) (A)[2] respectively. On appeal, the defendant claims (1) that the state committed prosecutorial misconduct during cross-examination and in closing argument, (2) that the trial court improperly instructed the jury on the element of intent and the concept of reasonable doubt, (3) that the court improperly denied his motion to suppress his written statement and (4) that the court improperly applied its belief that the defendant had committed perjury as a factor in sentencing. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. At the time of the incident giving rise to his convictions, the defendant was distraught because his former girlfriend had terminated their relationship. The defendant "still wanted to be with [her, but] she didn't want anything to do with [him]." In the wake of this loss, the defendant spent a great deal of his free time at William MacLellan's small basement apartment in Waterbury. Through MacLellan, the defendant met the victim, Lisa Orgnon, in October, 1997. Over the course of approximately one month, the defendant and the victim socialized at drinking establishments in the Waterbury area "a couple of times." The victim, MacLellan and the defendant planned to spend the evening of November 18, 1997, together.

At roughly 9 p.m. on the evening of the incident, the victim, MacLellan, and the defendant walked from MacLellan's apartment to "Champ's Cafe." They shared four pitchers of beer, "did some shots of Goldschlager"

---

[1] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ."

[2] General Statutes § 53a-92 (a) provides in relevant part: "A person is guilty of kidnapping in the first degree when he abducts another person and . . . (2) he restrains the person abducted with intent to (A) inflict physical injury upon him or violate or abuse him sexually . . . ."

and played billiards until the staff closed the establishment for the evening at roughly 11:30 p.m. The three then returned on foot to MacLellan's apartment, where they conversed briefly and decided to go to another drinking establishment, "MacFairlawn's Tavern," before retiring for the evening. The victim agreed to drive them to MacFairlawn's in her white Pontiac Sunbird.

At MacFairlawn's, MacLellan and the victim continued to play billiards and the defendant ordered another pitcher of Heineken beer and "stayed at the bar and talked to the bartender." The three left the bar together at closing time and drove back to MacLellan's apartment. At this point, MacLellan decided to turn in for the evening. The defendant asked the victim to accompany him to a movie theater that he used to frequent near his former girlfriend's Southington home. The defendant "knew [the theater] was closed" before he suggested the excursion. The victim drove the defendant to the theater at 2 a.m., at which time she learned that the theater was closed while the defendant feigned surprise.

The defendant then told the victim to "drive around" and, keeping their destination a secret, directed her to an area of Southington which he knew to be his former girlfriend's neighborhood. He did not inform the victim that his former girlfriend lived in the area. Moments later, they were driving down the defendant's former girlfriend's residential street. As they passed by her house, the defendant reached across the victim's seat and hit her steering wheel as she was trying to drive, blasting the vehicle's horn in order to disturb his ex-girlfriend's household after 2 a.m. The defendant then ordered the victim to stop the vehicle on an adjoining street, Autran Avenue.

Although the reasons are unclear,[3] the defendant suddenly "got real mad" at some point after the vehicle halted. In the defendant's own words: "You know, I just—I just lost control. And I just began, I began to swing at her." "I don't know why but I started punching Lisa in her face and head even though she had done nothing wrong. I punched her four or five times." "She just tried to get away." The defendant punched the victim with such force that days later, he had abrasions on his knuckles, which he explained to a nurse were "from punching." As the victim attempted to "get away" from the defendant's unprovoked assault, the defendant grabbed her by the neck and began to strangle her. The defendant choked the victim, crushing her voice box and hemorrhaging the strap muscles in her neck. The defendant strangled the victim with such force that the whites of her eyes turned blood red from petechial hemorrhaging of the capillaries in her conjunctiva. The victim buried her fingernails into the defendant. Forensic analysis later revealed that nine of her ten fingernails had drawn blood in the melee. The defendant sustained scratches on his face and neck, and all over his back and shoulders. Stymied by the victim's effective counterattack, the defendant lost his grip on the victim's neck. She opened the door and began to spill out, head first, onto the street. The defendant clutched and swiped at her in a futile effort to regain dominance, but the victim kicked at him, checking his renewed assault. The victim broke free and sprinted down the road, away from defendant. The defendant jumped into the driver's seat and gunned the engine, aiming the vehicle at the victim.

---

[3] The defendant asserted several explanations for his sudden rage. At trial, he claimed that he was suffering from a sort of displaced rage about his ex-girlfriend that he then misdirected toward the victim. In his written statement, he claimed: "I don't know what came over me, but I got real mad at *myself*. I knew that I shouldn't be with Lisa because I still loved Kerry. I don't know why, but I started punching Lisa in her face and head even though she had done nothing wrong." (Emphasis added.)

The defendant slammed the car into the victim. The front bumper shattered her right leg at a point nine inches from her heel. Expert forensic evidence introduced at trial indicated that this was "a fairly typical pedestrian type [of] injury, where the bumper would strike the lower leg . . . ." The vehicle's right front wheel ran over the victim and her body smashed into the undercarriage. The defendant continued to run over the victim and felt the rear transaxle vault over her body. The defendant later stated that he "wasn't sure" whether he put the car in reverse to run her over again. The street was littered with blood in a long trail resulting from how he, in his own words, "dragged her up the road."

In addition to the injuries from the previous punching and strangling, the vehicle mangled and crushed the victim's body. Evidence introduced at trial established that the victim sustained multiple blunt force trauma to her head and face, including a large and deep L-shaped laceration to her entire right cheek, and another laceration above her right eye. Her nose was scored and abraded, her lips and right forehead were bruised, and the entire left side of her face, from her chin to her ear, was scraped deep purple. Two major lacerations split the back of the victim's head, straight through to her skull. A mass of blood pooled at the back of the victim's head, between her skull and scalp. Inside, a film of blood covered the victim's brain, which had suffered heavy bruising. In addition to the injuries to the victim's neck due to strangulation, the vehicle caused linear abrasions to her neck. The victim suffered extensive blunt force trauma to her chest. Her rib cage was crushed, with fractures at the front and back. Both of her lungs were severely bruised in the process, filling with almost a pint of blood. Lower in the victim's abdomen, her liver was "essentially torn in half."

The defendant then stopped the car, stepped out and approached the victim's body. In his own words, the defendant "kicked the victim in the head and neck five or six more times" until she "wasn't moving at all" any more. Finally satisfied that he had killed the victim, the defendant dragged her body out of sight, hiding it in some "icy brush" over a ridge at the side of the road. The defendant drove the victim's car back to his home town of Waterbury and dumped it in a church parking lot. He walked the rest of the way home.

The victim, Orgnon, died in the early morning of November 19, 1997. The medical examiner certified the cause of death to be "multiple blunt force trauma of the head and chest." The medical examiner found no sign of any natural cause that would otherwise account for her death.

It was life as usual for the defendant that day. He awoke at the ordinary time and arrived at the site of his job with his father's construction company. However, after the victim's mother reported the victim missing, the Naugatuck police interrupted the defendant's schedule, asking him for information.[4] The defendant initially denied ever being with the victim in Southington, telling the police that the victim "drove [him] directly home" after dropping MacLellan at his house. After the body was found, however, the defendant admitted that he had, in fact, killed her.

The jury returned a verdict of guilty of murder and kidnapping in the first degree. The defendant was sentenced to a total effective sentence of seventy-five years imprisonment. Further facts and procedural history will be set forth where necessary.

First, we take up the defendant's claim that the state committed prosecutorial misconduct during cross-

---

[4] The Naugatuck, Waterbury and Southington police departments all assisted in the investigation of this homicide.

examination and closing argument. The defendant argues that on cross-examination about alleged oral and written confessions, the state improperly asked the defendant whether other witnesses were lying when they testified in conflict with his testimony. The defendant also argues that the state improperly capitalized on this questioning during closing arguments, offering the same view of the evidence assumed in the questioning—that the jury would have to believe that certain state's witnesses had lied in order to adopt the defendant's testimony. Finally, the defendant takes issue with the state's comment during closing arguments that "you intend the natural consequences of your actions."

The defendant did not raise these prosecutorial misconduct issues at trial. The defendant seeks to prevail, nonetheless, under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). The defendant claims that a constitutional violation clearly exists which the record is adequate to review. See id. Because we conclude that a constitutional violation does not clearly exist, we affirm the judgment of the trial court.

We first set forth our standard of review for claims of prosecutorial misconduct. "To prove prosecutorial misconduct, the defendant must demonstrate substantial prejudice. . . . In order to demonstrate this, the defendant must establish that the trial as a whole was fundamentally unfair and that the misconduct so infected the trial with unfairness as to make the conviction a denial of due process." (Citations omitted; internal quotation marks omitted.) *State* v. *Singh*, 259 Conn. 693, 699, 793 A.2d 226 (2002).

"Prosecutorial misconduct may occur in the course of cross-examination of witnesses; *State* v. *Hafner*, 168 Conn. 230, 249, 362 A.2d 925, cert. denied, 423 U.S. 851, 96 S. Ct. 95, 46 L. Ed. 2d 74 (1975); and may be so clearly inflammatory as to be incapable of correction

by action of the court. Id., 252–53. 'In such instances there is a reasonable possibility that the improprieties in the cross-examination either contributed to the jury's verdict of guilty or, negatively, foreclosed the jury from ever considering the possibility of acquittal.' " *State* v. *Williams*, 204 Conn. 523, 538–39, 529 A.2d 653 (1987).

"[P]rosecutorial misconduct of constitutional proportions may [also] arise during the course of closing argument, thereby implicating the fundamental fairness of the trial . . . ." (Internal quotation marks omitted.) *State* v. *Singh*, supra, 259 Conn. 700, quoting *State* v. *Burton*, 258 Conn. 153, 165, 778 A.2d 955 (2001). "Such argument may be, 'in light of all of the facts and circumstances, so egregious that no curative instruction could reasonably be expected to remove [its] prejudicial impact.' *State* v. *Fullwood*, 194 Conn. 573, 585, 484 A.2d 435 (1984)." *State* v. *Williams*, supra, 204 Conn. 539.

In determining whether a defendant's right to a fair trial has been violated, "[w]e do not focus alone . . . on the conduct of the prosecutor. The fairness of the trial and not the culpability of the prosecutor is the standard for analyzing the constitutional due process claims of criminal defendants alleging prosecutorial misconduct. *State* v. *Palmer*, 196 Conn. 157, 163, 491 A.2d 1075 (1985), quoting *State* v. *Ubaldi*, 190 Conn. 559, 562, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983)." (Internal quotation marks omitted.) *State* v. *Williams*, supra, 204 Conn. 539–40. "[T]he aim of due process is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused." (Internal quotation marks omitted.) *Smith* v. *Phillips*, 455 U.S. 209, 219, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982).

"In determining whether prosecutorial misconduct was so serious as to amount to a denial of due process, [our Supreme Court], in conformity with courts in other

jurisdictions, has focused on several factors. Among them are the extent to which the misconduct was invited by defense conduct or argument; *State* v. *Fullwood*, supra [194 Conn. 573]; *State* v. *Falcone*, 191 Conn. 12, 23, 463 A.2d 558 (1983); the severity of the misconduct; see *United States* v. *Modica*, 663 F.2d 1173, 1181 (2d Cir. 1981) [cert. denied, 456 U.S. 989, 102 S Ct. 2269, 73 L. Ed. 2d 1284 (1982)]; the frequency of the misconduct; *State* v. *Couture*, [194 Conn. 530, 562–63, 482 A.2d 300 (1984), cert. denied, 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985)]; see *State* v. *Doehrer*, [200 Conn. 642, 654, 513 A.2d 58 (1986)]; *State* v. *Palmer*, supra, [196 Conn.] 163; the centrality of the misconduct to the critical issues in the case; *Hawthorne* v. *United States*, 476 A.2d 164, 172 (D.C. App. 1984); the strength of the curative measures adopted; *United States* v. *Modica*, supra [1181]; *Harris* v. *United States*, 402 F.2d 656, 657 n.1 (D.C. Cir. 1968); *State* v. *Doehrer*, supra [654]; and the strength of the state's case. See *United States* v. *Modica*, supra [1181]; *State* v. *Couture*, supra, 564; *State* v. *Glenn*, [194 Conn. 483, 492, 481 A.2d 741 (1984)]." *State* v. *Williams*, supra, 204 Conn. 540.

The defendant first argues that the state should not have asked the defendant to comment on the veracity of other witnesses. While we agree that some of the state's questions were improper, we hold that the impropriety did not cause substantial prejudice. It is not reasonably possible, given the strong physical evidence of the defendant's guilt that "the improprieties in the cross-examination either contributed to the jury's verdict of guilty or . . . foreclosed the jury from ever considering the possibility of acquittal." (Internal quotation marks omitted.) Id., 539.

The following additional facts are relevant to our resolution of this issue. When the defendant took the stand in his own defense, he testified inconsistently with signed and oral statements that the police said he had given. As a result, his testimony contradicted the

testimony of many of the state's witnesses in several respects. On cross-examination, the state confronted the defendant with those inconsistencies. See *Davis* v. *Alaska*, 415 U.S. 308, 316, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974) ("cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness"); see generally C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. 1988) § 7.24.3 (a), pp. 207–209 ("witness can be impeached by proof that he has made prior statements . . . that are inconsistent with his in-court testimony").

At one point, the defendant denied knowing in advance that the movie theater to which he and the victim had driven on the evening in question would be closed before they arrived. The state challenged this testimony as follows:

"Q. And, one of the things that Detective Shanley testified to is that you told him that you knew that the movie theaters were closed that night?

"A. No, sir. I never told him that.

"Q. Okay. So, when Detective Shanley puts that in his report, he's filing a false report, isn't he?

"A. I never said that to him.

"Q. Well, that's not my question. My question is, if he puts that in his report, that's false, isn't it?

"A. Yes, sir.

"Q. Okay. And, when Detective Shanley takes the witness stand, and sits in the very chair that you are in, and swears under oath to the truth, and he says that you told him that, *Detective Shanley is lying, isn't he*?

"A. Yes, sir.

\* \* \*

"Q. So, you never said that?" (Emphasis added.)

This same line of questioning was repeated after a great deal of intervening testimony. The state asked:

"Q. Okay. So, *they made that part* [of your written statement] *up*?

"A. Well, I told them we did go to Showcase [Cinemas], yes.

"Q. What about the part whether or not you knew it was closed?

"A. No, I never told them that, no." (Emphasis added.)

Later, the state challenged the defendant's current version of the incident itself. On direct examination, the defendant had stated: "You know, I just—I just lost control. And I just began, I began to swing at her and she just tried to get away." Defense counsel specifically asked the defendant, "Did you strike at her?" and the defendant responded, "Yes, sir." In a written statement taken by the Waterbury police, the defendant stated: "I don't know why but I started punching Lisa in her face and head even though she had done nothing wrong. I punched her four or five times and she jumped out of the car." In an oral statement to the police, the defendant had stated that he clenched his hands around the victim's neck and choked her for the dual purpose of preventing her escape and injuring her. On cross-examination, however, the defendant reversed his position on these points, stating that he never choked the victim or punched her, but had merely slapped her a single time. The defendant stated:

"A. It was more of like pushing . . . more pushing her away.

* * *

"Q. Okay. So more of a push. Okay. So you slapped her once, and then pushed her.

"A. Yes."

The state tested the credibility of this more recent testimony as follows:

"Q. Now, if you recall, you made a statement to the Waterbury detectives, correct?

"A. Yes, sir.

"Q. And, in that statement, do you recall telling the detectives, I don't know why, but I started punching Lisa in her face and head, even though she had done nothing wrong. I punched her four or five times?

"A. No, sir.

"Q. Okay. Did you say that to the Waterbury detectives?

"A. No, sir.

"Q. Now, when you gave that statement, they testified that you'd been read your rights, twice. And, do you remember having them read you your rights?

"A. Yes, sir.

"Q. . . . [Y]ou swore to the truth of this. You've raised your right hand, and swore to it, didn't you?

"A. No, not to that, no.

\* \* \*

"Q. And, they testified that you swore to the truth of that statement, that I've just made reference to?

"A. No, sir.

"Q. Okay. So you didn't [do] that either?

"A. No, sir.

"Q. Okay. So, when Officer Clary and Coyle and Shanley testified, that you swore to the truth of that, that was not accurate?

"A. Yes, sir.

"Q. Okay. And, you never told them, that you hit her four or five times, correct?

"A. No, sir.

"Q. Okay. Now, Detective Shanley and Sergeant Palmieri also said that you told them on the ride back, in the cruiser, that you choked her. You had your hands around her neck, and you were trying to stop her from getting away. And you were choking her. Did you tell Detective Shanley and Sergeant Palmieri that?

"A. No, sir.

"Q. So, when they came in, and they testified, and they sat in that chair that you were in, and were under oath, that you said that, *they were lying*?

"A. I never said that to him.

"Q. *That makes them liars, doesn't it*?

"A. I'm not here to judge anybody.

"Q. That's very true, isn't it. In fact, *they were lying, weren't they*?

"A. I never said that to them, no.

* * *

"Q. But there's no possible way that you could have choked her?

"A. No, sir.

"Q. That's something you'd remember?

"A. Yes, sir." (Emphasis added.)

The state later asked whether the entire confession during the defendant's drive with the Southington police "was completely made up" by the police. The defendant replied that he was "quiet the whole ride" and that the

"[o]nly time [he] spoke the rest of that night was to call [his] mother."

The state also cross-examined the defendant about his testimony that he did not kick the victim while she lay bleeding in the street after he ran her over with her own car and "dragged her up the road." In his written statement to the Waterbury police, the defendant had stated, "I stopped the car and got out and kicked her in her face and body about five or six more times. Lisa wasn't moving at all now." That statement was followed by the defendant's handwritten initials. The state cross-examined the defendant about this subject matter as follows:

"Q. Now, you gave a statement to the Waterbury police department. And in your statement, what you say is, I stopped the car and got out and kicked her in her face and body about five or six more times. Lisa wasn't moving at all now. And your testimony here, today, is that you never kicked her?

"A. No, sir.

"Q. Now, do you remember giving that statement to the Waterbury police?

"A. No, sir.

"Q. You have no recollection, whatsoever, [of] giving that statement to the Waterbury police department?

"A. Never told them that. No, sir.

* * *

"Q. Okay. And, with respect to that statement, you've already testified that you never swore to the truth of that statement. *The officers were not being truthful when they said that you had?*

"A. No, sir.

* * *

"Q. Okay. So is your testimony, here today, and I want you to listen to this carefully. Is your testimony here today, that you didn't tell the Waterbury police detectives, Officers Clary and Coyle, that you kicked her? Or is your testimony here today, that you can't recall telling them that you kicked her?

"A. I never told them that I kicked her.

"Q. *Okay. So, they fabricated that part of your statement, as well?* . . .

"A. Yes, sir.

"Q. *They made it up?*

"A. I never told them that, sir.

"Q. *All right. And so they made it up?*

"A. I never told them that, yes." (Emphasis added.)

The state also asked the defendant to explain a discrepancy concerning whether he had returned to the location where he dumped the victim's car. In the same written statement, the defendant stated that he returned to the vehicle on the following day to remove bloody clothing that he had hidden under the seat. The defendant denied this on the witness stand. The state asked:

"Q. So where it says that you went back to maybe retrieve bloody clothes in the vehicle, *that's made up*, correct?

"A. Yes, sir." (Emphasis added.)

In light of the inconsistencies between the defendant's written statement and recent testimony, the state asked the defendant whether he had any "inkling idea how that document came to be prepared?" The defendant responded, "I mean, I told them, I told them my

story. What I said here, spoke here in court today." The examination proceeded:

"Q. *So, when the Waterbury officers got up and testified how that document came to be prepared, they were lying?*

"A. I never said that to them, no." (Emphasis added.)

The state then began to lead the defendant through the statement, paragraph by paragraph, and asked whether the defendant had told the police the substance of it. At first, the defendant attempted to advert to his current testimony, but the state considered this nonresponsive. The testimony was as follows:

"A. I just spoke to the statement I gave them, was what I spoke here today. [Sic.]

"Q. Okay. Well, that's a good answer. But it's not the answer to my question. My question is, did you tell them that?"

The defendant finally answered that he had relayed one piece of information in that paragraph, but that the remainder was false. Subsequent testimony revealed, however, that the defendant wanted to modify this position, admitting that he had relayed to the police another fact that appeared in that paragraph. This testimony was as follows:

"Q. Okay. And you did not tell them that you had taken Lisa out a few times?

"A. Yeah, that was discussed.

"Q. Okay. Well, you just told me the only part of that paragraph you told them was about [your former girlfriend]?

"A. Well, I didn't give this statement, so."

The state's frustration reached a nadir:

"Q. Okay. But you understand, I'm asking you questions about this statement?

"A. Yes, but I—

"Q. *And we're going to go through it, and I'm going to find out what you told them, and what all those police officers were lying about. Okay?* So we're going to go through this?

"A. Well, I never—

"Q. And it might be quicker if you answer my questions?"

As the state ventured into the substance of the statement related to the incident itself, it asked the following:

"Q. Now, we're on page two of a four page statement, right?

"A. Yes, sir.

"Q. And, *at this point, it seems that there have been a lot of lies, in connection with other witness' testimony.* Is that accurate?

"A. I can't answer for no one else." (Emphasis added.)

The state's questioning in which it sought to force the defendant to characterize other witnesses as "liars" or their testimony as "lies" is improper under our Supreme Court's recent holding in *State* v. *Singh,* supra, 259 Conn. 706–11. Even prior to *Singh,* the "evidentiary rule that it is improper to ask a witness to comment on another witness' veracity" was well established in other jurisdictions. Id., 706. Asking the defendant whether witnesses testifying against him are "lying" is usually a form of unchecked testimony by counsel because it assumes facts not admitted into evidence. See id., 708 (such questioning is "improper and argumentative"). Such compound questioning assumes that the inconsistencies between the witnesses' testimony

can only be explained by deliberate misrepresentation. Id., 710. However, "testimony may be in direct conflict for reasons other than a witness' intent to deceive. *United States* v. *Narisco* [446 F. Sup. 252, 321 (E.D. Mich. 1977)] . . . ." *State* v. *Singh*, supra, 711.

In the context of the entire trial, however, these instances of improper questioning did not cause substantial prejudice or undermine the fairness of the trial. To assess whether substantial prejudice flowed from the misconduct, we first consider the factors suggested in *State* v. *Williams*, supra, 204 Conn. 540. As explained in *Williams*, these factors are nonexhaustive, and do not serve as an arithmetic test for the level of prejudice flowing from misconduct. The ultimate question is whether the defendant suffered substantial prejudice, and this assessment turns on the unique characteristics of each case.

As the quoted extracts show, the misconduct was relatively frequent throughout cross-examination. The state asked the defendant whether other witnesses were "liars" or "lying" eight times. The state asked the defendant whether other witnesses had "made up" or "fabricated" conflicting evidence six times. The misconduct was also relatively severe. It pushed the defendant to condemn and characterize the testimony of others as lies, and their very nature as "liars." The defendant did not object or request curative measures and the court did not give any curative instruction. The improper questions do not appear to have been invited by the conduct of defense counsel. The misconduct was addressed largely to the written and oral confessions that the defendant made to the police, an important part of the state's case. There was, however, much other overwhelming evidence of guilt apart from the defendant's inculpatory pretrial statements.

The misconduct was not prejudicial. The state's case against the defendant was strong, absent any unfair

advantage from asking the defendant to state whether other witnesses were lying. We now set forth some of that strong forensic and physical evidence.

First of all, the universe of physical evidence admitted in this case indicates unequivocally that the defendant engaged in a prolonged series of brutal assaults of the victim prior to her death; the defendant's version of the confrontation as a single slap followed by a push is flatly contradicted. Dr. Edward T. McDonough, deputy chief medical examiner, testified at length about several injuries to the victim which strongly support the inference that the defendant did, in fact, strangle her. For example, McDonough found that the victim suffered petechial hemorrhages to the conjunctiva, i.e. the lining, of both eyes: an injury which is "consistent with choking." The cartilage of the victim's larynx, i.e. "voice box", was fractured and the strap muscles in her neck were hemorrhaged. These injuries also indicated strangulation. The defendant himself had physical injuries consistent with a sustained struggle. The defendant had scratches on his neck, shoulders, back and flank. McDonough took fingernail scrapings from the victim and nine of her ten fingernails later tested positive for the presence of blood. There was no evidence that the victim had burrowed nine of her ten fingernails into any other person's skin that evening, and the defendant's own trial testimony indicated that she was in his presence the entire evening and following morning until she perished. The defendant attempted to explain away his physical scratch wounds by saying that he had been in a fight with his father that same evening. But the defendant's father denied that any such fight took place, and no physical evidence indicating that the father had been in a fight was introduced. The physical evidence presented was thus consistent with the defendant's having received these scratches from the victim's attempts to defend herself from his attacks. Further, the defen-

dant had abrasions on his knuckles, consistent with punching the victim. Again, the defendant denied ever punching the victim when he took the witness stand. When he was examined at Saint Mary's Hospital, however, he confessed to the attending nurse that he "received those abrasions from punching." All of this evidence that the defendant brutally beat and strangled the victim completely diffused any force in the defendant's testimony to the contrary. Any advantage from the improper questioning or argument was minimal in light of the strength of the state's case. Furthermore, this evidence of brutal, intentional violence, in a series of violent acts, including punching and strangling her in the car, then chasing and running her over, followed by kicking her in the head as she lay on the ground, is strong evidence from which the jury could infer the defendant's *mens rea*, his intent to cause the death of the victim. The defendant concedes that this was the only essential element of the offenses that was in dispute at trial. In his brief, the defendant stated, "no one is disputing the fact that the defendant caused the death of the victim."

The defendant's version of having accidentally run the victim over is also contradicted by the physical evidence. On the stand, the defendant testified that after the victim fled the car, he simply did not notice where she went, and somehow accidentally ran her over with the car. The defendant claimed that he had no way of knowing he had run her over until he heard a curious "bump" from the back of the car. Forensic evidence of the car and victim, however, revealed that the car hit the victim head-on, with its *front* bumper and *front* wheel. This was consistent with the defendant's earlier pretrial statements, which he denied on the witness stand, that he purposely chased and ran the victim down with her own car as she fled for her life. McDonough discovered a compound lower leg fracture, nine inches

up from the victim's heel, which he testified was "a fairly typical pedestrian type of injury, where the [front] bumper would strike the lower leg . . . ." The automobile's right front hubcap was spattered with blood that tested positive for the victim's DNA. The undercarriage was also covered with the victim's blood and clumps of her hair at several points. A sketch map of the crime scene, admitted into evidence, reveals a long trail of bloodstains from the victim. This evidence is consistent with a persistent "drag" of the victim's body down the road, as the defendant had initially stated, not an isolated bump after which the defendant immediately stopped the car, as he testified during cross-examination. As with the evidence of strangulation, this strong evidence minimizes the effect of the improper questioning on this subject. It is very strong evidence from which the jury could infer that the defendant intended to cause the death of the victim. It leads to the conclusion that the defendant suffered no substantial prejudice because of the state's improper questioning.

Further still, the physical evidence supported the state's theory that the defendant had kicked the victim in the head after running her down with her own car. The defendant stated on the witness stand that he had done no such thing, denying that he even made his earlier statement that he had "kicked her in the head." Acting on a search warrant, the state seized the sneakers that the defendant was wearing that evening and conducted forensic testing. A scientist at the forensic biology unit of the state forensic science laboratory recovered hair from the defendant's left sneaker. Under a comparison microscope, the hair had characteristics identical to a known sample taken from the victim's head during autopsy. This scientist testified that she had never seen a false match in her fifteen years of experience. This evidence of kicking the victim in the head, after she had had already been run over by a car,

evinces the defendant's intent to kill in a way that leaves little to the jury's imagination.

The jury reasonably could have found that the defendant's concerted effort to hide the victim's body and dump her vehicle coupled with his failure to contact any emergency personnel also evinced his consciousness of guilt. If the entire calamity were, as the defendant most recently testified, an accident, he would be less likely to secret her body, dispose of the car, and lie to the Naugatuck police about having no idea what could have happened to her. The defendant deliberately kept the homicide a secret, leaving the victim's family to search for her frantically until her dead body was discovered by chance almost thirty-six hours later.

Finally, the raw incredibility of the defendant's testimony on its own terms concerning the incident also lessens the impact of the state's improper cross-examination. The idea that the defendant simply did not see the victim in front of the car he was driving, and somehow hit her only with the rear of the car, is illogical. The defendant testified that the victim was "g[etting] away" from him after he had struck her. The idea that he simply did "not notice" that she was running down the road in front of the car is implausible. The concept that he, for some urgent need unrelated to a desire to run her over, coincidentally sped down the road at her is not credible. The idea that his first realization of hitting anything was a curious bump at the rear of the car is unbelievable. Her body would not, and did not, pass without event under or around the front of the vehicle. Rather, the front bumper smashed into her right leg and the front wheel ran her over and crushed her. The patent incredibility of the defendant's testimony also lessens any prejudicial impact from the improper questioning. Thus, the defendant suffered no substantial prejudice from the impropriety on cross-examination.

Our holding on this claim is not inconsistent with recent decisions reversing convictions for similar misconduct. In none of those cases was the independent forensic evidence of the defendant's guilt as strong. In the arson case of *State* v. *Singh*, supra, 259 Conn. 693, which reversed a conviction because of prosecutorial misconduct, the "sole piece of physical evidence linking the defendant to the crime scene was a pair of the defendant's shoes, which tested positive for the presence of a petroleum based product consistent with gasoline. The defendant [had] contended that the shoes had gasoline on them because he wore them regularly when filling his taxicab tank with gasoline and that he had, in fact, worn the shoes to fill the tank just hours before the state seized the shoes." Id., 703. With the sparse physical evidence, the state's impropriety in cross-examination, asking the defendant whether contradictory witnesses were "lying," was far more critical to the state's case. The state had no compelling physical evidence tying that defendant to the crime and, as a result, relied heavily on the testimony of the witnesses in question.

In *State* v. *Thompson*, 69 Conn. App. 299, 797 A.2d 539, cert. granted, 260 Conn. 936, 802 A.2d 90 (2002), the state's case relied heavily on eyewitness statements placing him at the scene of the crime and the improper questioning concerned the weight of that critical evidence. As we stated in that case: "To find the defendant guilty, the jury had to find that the defendant was in the car with the rifle, exited the car with the rifle and ran between two buildings, that a shot rang out that killed the victim and that the defendant must have fired that shot." Id., 313. No independent physical evidence demonstrated these facts. The dearth of independent physical evidence is a sharp contrast with the present case.

Likewise, in *State* v. *Stevenson*, 70 Conn. App. 29, 44, 797 A.2d 1 (2002), the state's case hinged on a signed confession by the defendant, rather than physical evidence of guilt. To quote *Stevenson*, "the only evidence linking the defendant to the crimes charged was the signed confession and the information he provided to the officers during his interrogation." Id.

In the recent case of *State* v. *Payne*, 260 Conn. 446, 451–52, 797 A.2d 1088 (2002), our Supreme Court exercised its supervisory authority over the administration of justice to address a pattern of misconduct by the individual prosecutor in question in that case. The defendant has not requested that we invoke this authority, nor has he set forth evidence of a sustained pattern of misconduct in other cases by this particular prosecutor which would make its use appropriate.

In his last claim of prosecutorial misconduct, the defendant argues that the state improperly stated the law to the jury during closing arguments. Specifically, the defendant contends that the prosecutor's statement that "a person normally intends the natural consequences of his actions . . . invited the jury to conclude that if the defendant were driving the victim's car when it hit her, that he intended to cause her death."

While it is true that such language is improper as an isolated statement of law; see *Sandstrom* v. *Montana*, 442 U.S. 510, 513–14, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979); in the state's final argument, the jury is presumed to have followed the instructions by the court that "the court, alone, is responsible for stating the law," not counsel during argument. The court correctly stated the role of closing argument as "intended to help you interpret the evidence . . . ." "The jury [is] presumed to follow the court's directions in the absence of a clear indication to the contrary. . . . *State* v. *Griffin*, 175 Conn. 155, 160, 397 A.2d 89 (1978); accord *State*

v. *Negron*, 221 Conn. 315, 331, 603 A.2d 1138 (1992). The rule that juries are presumed to follow their instructions is a pragmatic one, rooted less in the absolute certitude that the presumption is true than in the belief that it represents a reasonable practical accommodation of the interests of the state and the defendant in the criminal justice process. *Richardson* v. *Marsh*, 481 U.S. 200, 211, 107 S. Ct. 1702, 95 L. Ed. 2d 176 (1987)." (Internal quotation marks omitted.) *State* v. *Booth*, 250 Conn. 611, 626, 737 A.2d 404 (1999), cert. denied sub nom. *Brown* v. *Connecticut*, 529 U.S. 1060, 120 S. Ct. 1568, 146 L. Ed. 2d 471 (2000).

Furthermore, in the context of the surrounding argument, the language in question was qualified and clarified in such a way that its function as argument about permissible inferences and the strength of the evidence is unmistakable. In that context, the quoted language from the state's arguments should not be mistaken to be a binding statement of the law. "The functions of final argument by the attorneys and jury instructions by the court are obviously quite different. We know of no authority, reason or policy to equate the two in the context of this case." *State* v. *Velez*, 17 Conn. App. 186, 196, 551 A.2d 421 (1988), cert. denied, 210 Conn. 810, 556 A.2d 610, cert. denied, 491 U.S. 906, 109 S. Ct. 3190, 105 L. Ed. 2d 698 (1989).

The state began the sentence in question with the phrase, *"In short,"* indicating that what was to follow would be a synopsis, rather than a perfectly accurate statement. In the very next sentence, the state made the qualified, interpretive role of this argument difficult to misunderstand. The relevant context was as follows: "In short, you intend the natural consequences of your acts. An intent can be inferred from the natural consequences of your acts. We can't see into people's minds. We can't read people's minds. . . . And, *when I say you intend the natural consequences of your actions,*

*what I mean, is* that when [the defendant] talks about what he did at 2 in the morning, in the corner of Autran and Bishop Avenue, the natural consequences of those actions, the natural consequences of his beating Lisa Orgnon in the car, his trying to prevent her from getting away, trying to prevent her to the point of fracturing her larynx. . . . When [the defendant] then runs Lisa Orgnon over with her own car, and when [the defendant] then gets out of the car and beats her until she stops moving, and drags her body into the woods, *you can infer an intent to kill from those actions. And, in fact, when you look at those actions, and you look at the injuries on Lisa Orgnon, injuries literally from head to her shin, where she has that broken leg from being hit by the car, there is only one intent that can be inferred from those injuries.*" (Emphasis added.) Contrary to the defendant's claim, this argument did not invite the jury to find intent to kill merely from the act of "driving the victim's car when it hit her." The state interpreted evidence concerning a series of actions by the defendant and argued that the intent to kill was a reasonable inference. This is the legitimate and long-standing purpose of all closing argument. See, e.g., *State* v. *Prioleau*, 235 Conn. 274, 320, 664 A.2d 743 (1995). "Counsel may comment upon facts properly in evidence and upon reasonable inferences to be drawn from them." Id., citing *State* v. *Kinsey*, 173 Conn. 344, 348, 377 A.2d 1095 (1977).

The defendant offers no legal authority to the contrary. In fact, this claim is inadequately briefed, lacking citation of all of the language complained about related to any appropriate legal analysis or citation. See *State* v. *Brown*, 256 Conn. 291, 312–13, 772 A.2d 1107 (no authority citation or analysis), cert. denied, 534 U.S. 1068, 122 S. Ct. 670, 151 L. Ed. 2d 584 (2001). In sum, the defendant did not suffer substantial prejudice from

this aspect of the state's argument. We therefore reject this claim as lacking merit.

In his next claim, the defendant argues that the court's instructions to the jury about intent as an element of the crimes charged were improper, and that it is reasonably possible that these instructions misled the jury. More specifically, the defendant argues that the court's instructions on the law of inferences, proximate cause and intent contradicted one another and relieved the state of its burden to establish beyond any reasonable doubt that the defendant intended to cause the death of the victim.

Although the defendant is expected to object "immediately after the conclusion of the charge"; (internal quotation marks omitted) *State* v. *Snook*, 210 Conn. 244, 270, 555 A.2d 390, cert. denied, 492 U.S. 924, 109 S. Ct. 3258, 106 L. Ed. 2d 603 (1989); he nonetheless argues that he is entitled to review under *State* v. *Golding*, supra, 213 Conn. 239–40. We will engage in *Golding* review of this claimed instructional error because the record is adequate for review and the claim alleges the deprivation of a fundamental constitutional right. See id. The defendant alleges that a faulty instruction relieved the state of its burden to establish guilt beyond a reasonable doubt. Such an error would violate a defendant's fundamental right to a fair trial. See *In re Winship*, 397 U.S. 358, 363–64, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); *Lego* v. *Twomey*, 404 U.S. 477, 486, 92 S. Ct. 619, 30 L. Ed. 2d 618 (1972); *State* v. *Flowers*, 69 Conn. App. 57, 76, 797 A.2d 1122, cert. denied, 260 Conn. 929, 798 A.2d 972 (2002). Thus, we proceed to the merits of the defendant's claim.

On the merits, however, the defendant's claim fails. To prevail on an unpreserved claim of trial court error under *Golding*, the defendant must demonstrate, inter

alia,[5] that the "alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial . . . ." *State* v. *Golding*, supra, 213 Conn. 240. We hold that the defendant has not met this burden.

We first set forth the relevant law for a claim of instructional error. "When reviewing the challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts." (Internal quotation marks omitted.) *State* v. *Aponte*, 259 Conn. 512, 517, 790 A.2d 457 (2002). In other words, "individual instructions are not to be judged in artificial isolation from the overall charge." (Internal quotation marks omitted.) *State* v. *Brown*, 259 Conn. 799, 807, 792 A.2d 86 (2002). "[T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Internal quotation marks omitted.) *State* v. *Aponte*, supra, 517, quoting *State* v. *Denby*, 235 Conn. 477, 484–85, 668 A.2d 682 (1995).

"[I]n appeals involving a constitutional question, [the standard is] whether it is reasonably possible that the jury [was] misled. . . . *State* v. *Rodriguez*, 63 Conn. App. 529, 534, 777 A.2d 704, cert. denied, 256 Conn. 936, 776 A.2d 1151 (2001). . . . [U]nder prong three of *Golding*, a challenged jury instruction constitutes a clear constitutional violation that clearly deprives a defen-

---

[5] If we determined that a constitutional violation *did* clearly exist, *Golding* would then require us to consider whether the state has failed to prove that the violation was harmless beyond a reasonable doubt. *State* v. *Golding*, supra, 213 Conn. 239–40.

dant of a fair trial if it is found reasonably possible that the jury was misled by the court's instruction. . . . *State* v. *Orta*, 66 Conn. App. 783, 795, 786 A.2d 504 (2001), cert. denied, 259 Conn. 907, 789 A.2d 997 (2002)." (Internal quotation marks omitted.) *State* v. *Gonzalez*, 69 Conn. App. 649, 657, 796 A.2d 1225, cert. denied, 260 Conn. 937, 802 A.2d 91 (2002). "In determining whether it was . . . reasonably possible that the jury was misled by the trial court's instructions, the charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon the jury in guiding them to a correct verdict in the case." (Internal quotation marks omitted.) *State* v. *Pierce*, 69 Conn. App. 516, 533, 794 A.2d 1123 (2002).

First, the defendant contends that the trial court improperly included a section of the statutory definition of intent in its instruction on that element. The defendant likens his case to the facts of *State* v. *DeBarros*, 58 Conn. App. 673, 678, 755 A.2d 303, cert. denied, 254 Conn. 931, 761 A.2d 756 (2000), where we reversed a conviction because the trial court had improperly read the same provision seven times. The instruction in question is as follows: "As defined by our Penal Code, a person acts intentionally, with respect to a result *or to conduct*, when his conscious objective is to cause such result *or to engage in such conduct*." (Emphasis added.) The defendant argues that, as in *DeBarros*, the language relating to an intent to engage in conduct was not implicated in the charges and should not have been read to the jury. Absent any element of *intent to engage in conduct* in the charges, this language might mislead the jury to consider intent to engage in conduct adequate, even where a specific intent to cause a result is required. Id., 683.

However, this case is a far cry from *DeBarros*. As the state notes, the allegedly problematic charge is not

repeatedly interspersed throughout the charge, as it was in *DeBarros*. It is stated once, during a general background discussion of intent. The court later used this backdrop to elucidate elements of the kidnapping charge. These elements indeed involved the intent to engage in conduct, warranting the inclusion of that aspect of the definition in the general discussion.[6] In his reply brief, the defendant argues that this "erroneous instruction" misled the jury nonetheless because it was incorporated by reference in the instructions on the element of intent to kill. During its discussion of the element of intent to kill, the court did in fact state that it had "already discussed the question of intent with [the jury]" and that it would "not repeat it entirely here . . . ." The court then advised the jury generally to "keep in mind that the instructions previously given on this point are applicable." The majority of the general instructions on intent, aside from the few words at issue, were, in fact, applicable. Further, the court surrounded this reference with the repeated instruction that the state must establish that the defendant intended to kill the victim to be guilty. Although not technically perfect, it is not reasonably possible that the jury disregarded these more specific instructions out of confusion due to the reference to the general instructions on the law of intent, which contained some inapplicable language.

Next, the defendant observes that the trial court instructed the jury that "[i]t does not matter whether this particular kind of harm, that results from the defendant's act, be intended by him." The defendant implies that this instruction conflicts with the court's other instructions on the state's burden to prove beyond a reasonable doubt that the defendant intended to cause

---

[6] As the court later instructed, the defendant must have intentionally abducted and restrained the victim to be guilty. The acts of abduction and restraint implicate conduct as well as a result.

the death of another person. This argument ignores the larger context of the entire jury charge. The court gave the instruction in question during a discussion of the element of proximate causation, not the element of intent. In this context, the only interpretation reasonably possible was that it elucidated the law of proximate cause. While it's restrictive significance should have been further emphasized, it is not reasonably possible that the jury was misled. Just two sentences later, the trial court guided the jury on the separate element of intent. These instructions emphasized that the "state must prove, beyond a reasonable doubt, that the defendant caused the death of the victim, *with the intent to cause death.*" (Emphasis added.) Our holding as to this instruction is consistent with our Supreme Court's decision in *State* v. *Boles*, 223 Conn. 535, 613 A.2d 770 (1992); and our recent decision in *State* v. *Westberry*, 68 Conn. App. 622, 635–37, 792 A.2d 154, cert. denied, 260 Conn. 923, 797 A.2d 519 (2002). *Boles* dealt with almost identical language within a charge on the element of proximate causation. As the court stated in *Boles*: "The section of the trial court's instruction could only be misinterpreted as informing the jury that to find the defendant guilty of the victim's murder it had only to find proven that the defendant was the source of the conduct that caused her death, if we were to view the charge in isolation from what immediately preceded it." *State* v. *Boles*, supra, 541–42.

Finally, the defendant argues that the court's instruction to the jury that they had a "duty to draw all reasonable and logical inferences" conflicted with the court's instructions on the state's burden of proof beyond any reasonable doubt of every element of the crimes charged. While we agree that this portion of the charge was technically inaccurate, we hold that it is not reasonably possible that the jury was misled in reaching their verdict. The same conduct and surrounding circum-

stances may often yield conflicting inferences, each of which may still be reasonable and logical. It would be impossible for the jury to adopt "all" such inferences at once. Further, it is not reasonably possible that the jury failed to follow the court's other instructions, which correctly stated that the jury "*may* draw reasonable inferences from facts that [they] find proven." (Emphasis added.) Although generally a jury's inferences need only be rationally drawn, in order to infer the essential element of intent to cause the death of a person, that inference must be beyond any reasonable doubt. The court emphasized this bedrock constitutional principle that a defendant must not be convicted absent proof beyond a reasonable doubt of each fact necessary to constitute the crime charged. *In re Winship*, supra, 397 U.S. 361–65. The court stated: "Proof beyond a reasonable doubt is proof which rules out every reasonable hypothesis except guilt, is consistent with guilt, and is inconsistent with any other reasonable conclusion."

The defendant raised another claim concerning the adequacy of language in the jury instructions defining the term "reasonable doubt." The defendant concedes that prevailing case law from our Supreme Court bars review of this claim. This case was initially briefed for submission to our Supreme Court, where the defendant hoped to persuade the court to alter the standard. We have no such power, and, thus, are bound to apply the existing law of this state as dictated by our Supreme Court.

The defendant's next claim on appeal is that the trial court improperly denied his motion to suppress his written statement to the Waterbury police. The defendant argues that based on the totality of the surrounding circumstances, his written statement was involuntarily rendered. We disagree.

The defendant's motion to suppress alleged that he was not adequately advised of his constitutional rights

and that he "failed or lacked capacity to waive those rights intelligently, voluntarily and knowingly." The state argues that, at trial, he made no claim that his confession was coerced. It therefore maintains that this claim may be rejected because the record is not adequate for review under the first prong of *Golding*. It contends, quoting *State* v. *Medina*, 228 Conn. 281, 300, 636 A.2d 351 (1994), that neither it nor the trial court was alerted to a voluntariness claim, "thereby depriving the state, the trial court and the reviewing court 'of a complete factual inquiry into the defendant's mental condition at the time his statements were made.' " In his reply brief, the defendant argues that he "has not claimed that his statement was coerced; he has claimed that his statement was involuntary." The defendant further argues that "[w]hile police coercion is a part of voluntariness, it is not a separate claim on appeal."

The defendant did raise on appeal the claim that his confession was involuntary. A relevant section of the defendant's brief reads: "The trial court should have found the confession involuntary, under the totality of the circumstances." Although the defendant's brief deals chiefly with aspects of alleged police coercion, these aspects are, as the defendant points out, within the totality of the circumstances that the trial court was bound to consider in assessing the voluntariness of the confession. That being said, the defendant is restricted to the record of evidence before the trial court indicating those circumstances. Insofar as the defendant failed to present evidence of coercion, we will not entertain such an argument with speculation.

The trial court found the following additional facts, which are relevant to our resolution of this claim. When he arrived at the Waterbury police department, in the company of his mother, the defendant was advised by Detective Eugene Coyle that he was not under arrest and that he was free to leave at any time. He again was

read his rights and signed a rights advisory card. The defendant signed the rights card and questioning began at 6:15 p.m. Coyle testified that there were no threats, promises or coercion applied against the defendant. The defendant made his admission about killing the victim within one-half hour. After admitting killing the victim, the defendant was no longer free to leave on his own. The defendant then left the Waterbury police station with the two policemen and led them to the location of the victim's vehicle, which he had parked at the rear of the Sacred Heart Church in Waterbury. The defendant was brought back to the station and put into a ten foot by twelve foot room, where he gave his written statement.

"Whether the defendant has knowingly and intelligently waived his rights under *Miranda*[7] depends in part on the competency of the defendant, or, in other words, on his ability to understand and act upon his constitutional rights. . . . Factors which may be considered by the trial court in determining whether an individual had the capacity to understand the warnings include the defendant's experience with the police and familiarity with the warnings . . . his level of intelligence, including his IQ . . . his age . . . his level of education . . . his vocabulary and ability to read and write in the language in which the warnings were given . . . intoxication . . . his emotional state . . . and the existence of any mental disease, disorder or retardation. . . . Furthermore, [a] defendant's express written and oral waiver is strong proof that the waiver is valid. . . . *State* v. *Lewis*, 60 Conn. App. 219, 244–45, 759 A.2d 518, cert. denied, 255 Conn. 906, 762 A.2d 911 (2000); *State* v. *Fernandez*, 52 Conn. App. 599, 610–11, 728 A.2d 1, cert. denied, 249 Conn. 913, 733 A.2d 229, cert. denied, 528 U.S. 939, 120 S. Ct. 348, 145 L. Ed. 2d

[7] See *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

272 (1999)." (Internal quotation marks omitted.) *State v. Williams*, 65 Conn. App. 59, 72–73, 782 A.2d 149, cert. denied, 258 Conn. 923, 782 A.2d 1251 (2001).

On the basis of all of the circumstances indicated in the record before us, the trial court properly concluded that the November 20, 1997 statement was admissible. The defendant had been given *Miranda* warnings orally and in writing several times. He stated repeatedly that he understood these rights and was willing to make the written statement anyway. He signed and dated two written documents indicating his willingness to cede these rights and initialed in the margin after the written description of each right waived. In all, he signed or initialed the statement itself fourteen times. He was literate. He had attained a high school diploma and had completed some collegiate course work. He read a full paragraph of the written statement aloud to the police by which they determined his literacy. The defendant was calm during questioning, showing no signs of emotional distress. The defendant had no clinical history of mental disease or retardation. He came into the police station voluntarily with a parent and confessed orally to killing the victim *before* he was in custody, within a half an hour to forty-five minutes of arriving at the station. He did not arrive at the station until almost 6 p.m.

There was no evidence of any threat, promise or physical coercion of him prompting any such inculpatory statement. The defendant correctly points out that he was detained for roughly three hours during the process of giving the statement, and there was no evidence that he ate or drank during that period. However, these facts alone do not render his statement involuntary under the totality of the circumstances. The defendant did not ask for food or water or indicate at any time that he was hungry, thirsty or fatigued. A three hour period is not an unusual stretch without food,

water or sleep for the average human being. The defendant does not even allege that he was hungry, thirsty or fatigued such that an absence of food, drink or sleep would have any significance. See, e.g., *State* v. *Lewis*, 60 Conn. App. 219, 248, 759 A.2d 518 (confession rendered six hours after arrest was voluntary), cert. denied, 255 Conn. 906, 762 A.2d 911 (2000).

Therefore, on the basis of the totality of the surrounding circumstances, the court reasonably concluded that the defendant's confession was voluntarily rendered.

Finally, the defendant claims that the court improperly applied, as a factor in sentencing, its belief that the defendant had lied when testifying. The defendant contends that considering his dishonest testimony in sentencing impermissibly burdened his right to testify on his own behalf, as guaranteed by the constitution of Connecticut. The defendant also argues that his state constitutional due process rights were violated because he suffered increased punishment for a crime that was never charged, perjury. This claim is unpreserved, and the defendant again seeks review under *State* v. *Golding*, supra, 213 Conn. 239–40. The defendant's claim does not satisfy the third requirement of *Golding* because the alleged constitutional violation does not "clearly [exist]." Id., 240. Accordingly, this claim also fails.

The defendant concedes that his federal due process rights were not violated. In *United States* v. *Grayson*, 438 U.S. 41, 98 S. Ct. 2610, 57 L. Ed. 2d 582 (1978), the United States Supreme Court determined that the right to due process under the constitution of the United States does not prohibit a sentencing court from considering reliable evidence that a defendant testified dishonestly. The analysis in *Grayson* begins with a discussion of the prevailing approach to sentencing in the United

States. Id., 45–48. At the time, the prevailing approach demanded that judges evaluate each convicted defendant's potential for rehabilitation before assigning a sentence within some statutory range for the particular crime. Id., 47–48. The court held that under the constitution of the United States, a sentencing judge may properly consider evidence that the defendant testified dishonestly, in order to assess his or her potential for rehabilitation. Id., 53–55. The court reaffirmed this position even after federal sentencing guidelines were later enacted, greatly reducing federal judges' discretion in sentencing.[8] See *United States* v. *Dunnigan*, 507 U.S. 87, 113 S. Ct. 1111, 122 L. Ed. 2d 445 (1993).

The defendant's claim depends, therefore, on the proposition that the constitution of Connecticut contains some distinct provision that prevents consideration of whether he testified dishonestly, despite its relevance as a factor in assessing his potential for rehabilitation. The defendant first points to article first, § 8, of the constitution of Connecticut, which provides in relevant part: "In all criminal prosecutions, the accused shall have a right to be heard by himself and by counsel. . . . No person shall be . . . deprived of life, liberty

[8] In *United States* v. *Dunnigan*, 507 U.S. 87, 92, 113 S. Ct. 1111, 122 L. Ed. 2d 445 (1993), the United States Supreme Court modified the rule in *Grayson* to comport with Sentencing Guideline § 3C1.1, which "states in full: 'If the defendant willfully impeded or obstructed, or attempted to impede or obstruct the administration of justice during the investigation or prosecution of the instant offense, increase the [defendant's] offense level by 2 levels.' U.S.S.G. § 3C1.1 (Nov. 1989)." Because wilful impediment or obstruction of justice is required under this guideline, "if a defendant objects to a sentence enhancement resulting from her trial testimony"; *United States* v. *Dunnigan*, supra, 95; a federal sentencing judge is required to "review the evidence and make independent findings necessary to establish a willful impediment to, or obstruction of, justice, or an attempt to do the same, under the perjury definition . . . ." Id. Contrary to the defendant's argument, this modification is not applicable to our state sentencing procedures since the federal guideline in question is not applicable in state courts. See *Erie Railroad Co.* v. *Tompkins*, 304 U.S. 64, 58 S. Ct. 50, 82 L. Ed. 1188 (1938).

or property without due process of law . . . ." The defendant contends that this provides him with a right to testify in his own defense, that was violated when the sentencing court considered his testimony to be dishonest.

This argument fails for two basic reasons. First, the phrase in question does not create a right for the defendant to testify on his own behalf. In 1818, when Connecticut adopted this language as part of our first constitution, a criminal defendant was *prohibited* from testifying on his own behalf. *State* v. *Gethers*, 197 Conn. 369, 392, 497 A.2d 408 (1985). At that time, the common-law rule that a criminal defendant, as the "*par excellence* [example of] an interested witness" was disqualified from testifying. Id., 391. Thus, the phrase "to be heard by himself" cannot possibly refer to the defendant's right to testify on his own behalf, as the defendant argues. "[T]wo related yet separate legal developments . . . may have culminated in the original adoption of this provision . . . ." Id., 388. One concerned the defendant's option to serve as his own legal counsel. Id. The other concerned a defendant's limited right to make an unsworn oral statement, even though he was not permitted to "give evidence" by testifying. Id., 391–92.

Second, even if the phrase "to be heard by himself" embodied the right to testify on one's own behalf in a criminal case, this does not distinguish the phrase from the constitution of the United States. The constitution of the United States also guarantees a criminal defendant the right to testify on his or her own behalf. For example, the United States Supreme Court considers the "right to testify on one's own behalf at a criminal trial" to be "one of the rights that 'are essential to due process of law in a fair adversary process.' *Faretta* v. *California*, 422 U.S. 806, [819 n.15, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975)]." *Rock* v. *Arkansas*, 483 U.S. 44, 51, 107 S. Ct. 2704, 97 L. Ed. 2d 37 (1987). As such, this

right "has sources in several provisions of the [United States] Constitution."[9] Id. Our own jurisprudence has long recognized that the federal constitution also guarantees the defendant's right to testify on his behalf. See, e.g., *State* v. *Paradise*, 213 Conn. 388, 404, 567 A.2d 1221 (1990). As noted by the United States Supreme Court, the existence of a right to testify does not lead, ipso facto, to the conclusion that the defendant should face no consequences from the abuse of that right. *United States* v. *Grayson*, supra, 438 U.S. 54. A criminal defendant's right to testify on his own behalf is not a right to commit perjury.

Nor are we persuaded that a claimed "chilling effect" on the legitimate exercise of the right to testify overrides the trial court's duty to consider all record evidence relevant to the question of the defendant's potential for rehabilitation. It is often a daunting task for the trial judge to attempt to assess accurately a particular defendant's capacity for rehabilitation. No fact-finding process can be perfect and enforcing a standard of perfection in fact-finding would bring government to a standstill. "Although we acknowledged that, as a general matter, principles of due process prohibit the state from penalizing a person for exercising his

---

[9] As we observed in *State* v. *Shinn*, 47 Conn. App. 401, 410, 704 A.2d 816 (1997), cert. denied, 244 Conn. 913, 914, 713 A.2d 832, 833 (1998): "The right to testify on one's own behalf at a criminal trial has sources in several provisions of the [United States] Constitution. It is one of the rights that are essential to due process of law in a fair adversary process. . . . The necessary ingredients of the Fourteenth Amendment's guarantee that no one shall be deprived of liberty without due process of law include a right to be heard and to offer testimony . . . . The right to testify is also found in the Compulsory Process Clause of the Sixth Amendment, which grants a defendant the right to call witnesses in his favor . . . . Logically included . . . is a right to testify himself. . . . The opportunity to testify is also a necessary corollary to the Fifth Amendment's guarantee against compelled testimony. . . . A defendant's right to testify is also protected by his rights to a fair trial, to due process, to present a defense, and to be free from compelled testimony under article XVII of the amendments to the Connecticut constitution and under article first, § 8, of the Connecticut constitution." (Citations omitted; internal quotation marks omitted.)

or her constitutional rights; see, e.g., *United States* v. *Goodwin*, 457 U.S. 368, 372, 102 S. Ct. 2485, 73 L. Ed. 2d 74 (1982); *Bordenkircher* v. *Hayes*, 434 U.S. 357, 363, 98 S. Ct. 663, 54 L. Ed. 2d 604 (1978) . . . it is also clear that the . . . constitution does not forbid every government-imposed choice in the criminal process that has the effect of discouraging the exercise of constitutional rights. . . . *Johnson* v. *Manson*, [196 Conn. 309, 327, 493 A.2d 846 (1985), cert. denied, 474 U.S. 1063, 106 S. Ct. 813, 88 L. Ed. 2d 787 (1986)], quoting *Chaffin* v. *Stynchcombe*, 412 U.S. 17, 30, 93 S. Ct. 1977, 36 L. Ed. 2d 714 (1973)." (Internal quotation marks omitted.) *Hammond* v. *Commissioner of Correction*, 259 Conn. 855, 866, 792 A.2d 774 (2002). "[B]y exercising his fifth amendment right to testify on his own behalf, it is axiomatic that a defendant opens the door to comment on his veracity. . . . [O]nce an accused takes the stand and testifies his credibility is subject to scrutiny and close examination." (Internal quotation marks omitted.) *State* v. *Alexander*, 254 Conn. 290, 297, 755 A.2d 868 (2000).

The defendant fares little better in his argument that any increased punishment for dishonest testimony must take the form of a full-dress charge and trial for the crime of perjury. The defendant notes that he has suffered increased punishment even though facts required to establish that his testimony was dishonest might not have been proven beyond a reasonable doubt in the trial by jury. This argument is identical to that raised in *Grayson*, and we see no reason to depart from *Grayson* in this respect under our state constitution. Taken to its logical extreme, the defendant's argument would forbid a sentencing court from considering *any and all* facts reflecting negatively on his capacity for rehabilitation, since they result in increased punishment. The application of the proof beyond a reasonable doubt standard does not turn on whether the facts in question

bear some close relation to elements of a conventional crime. Rather, that standard applies to facts necessary *to convict a defendant of a charged crime. In re Winship*, supra, 397 U.S. 358. The crime of perjury was not charged and the defendant did not receive the stigma of a conviction for perjury.

It will often be the case that facts indicating a lack of potential for rehabilitation happen to coincide with elements of crime. This is simply to say that the legislature has done its job competently in criminalizing anti-social conduct. A sentencing court should not be hamstrung from considering the most relevant facts to its sentencing duty, simply because it is possible to be separately charged with the crime of perjury and sentenced if those facts are proven beyond a reasonable doubt.

Our holding today is consistent with the general rules governing the nature of evidence that may be considered by a sentencing court. "Generally, due process does not require that information considered by the trial judge prior to sentencing meet the same high procedural standard as evidence introduced at trial. Rather, judges may consider a wide variety of information. . . . *United States* v. *Robelo*, 596 F.2d 868, 870 (9th Cir. 1979). Consistent with due process the trial court may consider responsible unsworn or out-of-court information relative to the circumstances of the crime and to the convicted person's life and circumstance. *Williams* v. *Oklahoma*, 358 U.S. 576, 584, 79 S. Ct. 421, 3 L. Ed. 2d 516 (1959). It is a fundamental sentencing principle that a sentencing judge may appropriately conduct an inquiry broad in scope, and largely unlimited either as to the kind of information he may consider or the source from which it may come. *United States* v. *Tucker*, 404 U.S. 443, 446, 92 S. Ct. 589, 30 L. Ed. 2d 592 (1972). . . . As long as the sentencing judge has a reasonable, persuasive basis for relying on the information which

he uses to fashion his ultimate sentence, an appellate court should not interfere with his discretion. See *United States* v. *Campbell*, 684 F.2d 141, 154 (D.C. Cir. 1982); *United States* v. *Robelo*, supra, 870.

"To hold otherwise would be to adopt an unrealistic view of both the plea bargaining and sentencing processes, a view that would only deter judges from articulating their reasons for a particular sentence fully and prevent correction when the sentencing judge relied on information which was truly unreliable, inaccurate or patently wrong. Trial judges ought not be reprimanded for acknowledging on the record the impact of information they have gained in the plea bargaining or sentencing processes unless the use of such information confounds reason and a just result. See *United States* v. *Campbell*, supra [684 F.2d 154]. 'Accordingly, when cases of this nature are heard on appeal, we should review the record to ensure that there is a persuasive basis for the conclusion reached by the sentencing court.' [Id.]" *State* v. *Huey*, 199 Conn. 121, 127–28, 505 A.2d 1242 (1986). There is in the evidentiary record and adequate basis for the court's conclusions as to the defendant's veracity.

Our holding is also consistent with other dicta stated in our case law. For example, in *State* v. *Coleman*, 242 Conn. 523, 544, 700 A.2d 14 (1997), the court opined that "evidence adduced at trial detailing the nature and extent of the offenses charged, as well as the defendant's conduct during the trial *and his veracity as a witness*, are among the considerations that the sentencing court may take into account in deciding whether to deviate from the original sentence."

The judgment is affirmed.

In this opinion the other judges concurred.