STATE OF CONNECTICUT *v.* WALBUR GONZALEZ
(AC 20764)

Mihalakos, Dranginis and Hennessy, Js.

Argued January 10—officially released May 14, 2002

*Michael T. Morley*, law student intern, with whom was *Glenn W. Falk*, special public defender, for the appellant (defendant).

*Mitchell S. Brody*, senior assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, *Warren Maxwell*, senior assistant state's attorney, and *David Zagaja*, assistant state's attorney, for the appellee (state).

*Opinion*

MIHALAKOS, J. The defendant, Walbur Gonzalez, appeals from the judgment of conviction, rendered after a jury trial, of conspiracy to commit murder in violation of General Statutes §§ 53a-48[1] and 53a-54a.[2] On appeal, the defendant claims that (1) there was insufficient evidence to support the conviction of conspiracy to commit murder, (2) the trial court impermissibly bolstered the prosecution's case and deprived the defendant of a fair trial by making several crucial findings of fact in the charge to the jury, and (3) the court impermissibly denied the defendant the presumption of innocence and shifted the burden of proof by informing the jury that he could not offer an alibi defense. We affirm the judgment of the trial court.

---

[1] General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

[2] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ."

The jury reasonably could have found the following facts. On July 13, 1994, the defendant was driving a blue Buick automobile with an individual named "Billy" in the front passenger seat and Delcy Dullary in the backseat of the vehicle. The defendant stopped for a red light at the intersection of Whitney Street and Capitol Avenue in Hartford. While driving a red car, James Girven approached the same intersection and stopped next to the Buick. Billy retrieved a rifle hidden under the passenger seat and began shooting at Girven.[3] Girven drove away, and the defendant followed with Billy and Dullary still in the Buick. A chase ensued during which the vehicles were traveling at speeds up to ninety miles per hour.

The chase came to an end when Girven's car smashed into a bridge abutment and the Buick crashed into the red car. Billy exited the Buick and approached the red car while the defendant and Dullary remained next to the Buick. Billy then fired several shots at Girven, killing him. The three men fled from the scene.

On December 23, 1996, the defendant was arrested in Puerto Rico pursuant to an arrest warrant and was extradited to Connecticut. On March 27, 1997, pursuant to Practice Book § 763, now § 40-21, the state filed a demand for alibi and a motion for compliance, to which the defendant did not respond. Thereafter, in a long form information, the defendant was charged with murder as an accessory and conspiracy to commit murder. The defendant's trial began on December 8, 1999. After the state presented its case-in-chief, the defendant moved for judgment of acquittal, which the court denied. On December 22, 1999, the jury found the defen-

---

[3] According to the state, Girven was a member of a street gang called 20 Love, Billy was a member of Nietas and the defendant was a member of the Latin Kings. Conflicts sometimes arose among the various gangs. At the time of the shooting, however, Nietas and the Latin Kings were allies and continued to have conflicts with 20 Love.

dant guilty of conspiracy to commit murder. The court declared a mistrial on the accessory count. On February 16, 2000, the defendant received a total effective sentence of seventeen years imprisonment. Additional facts and procedural history will be provided as necessary.

I

The defendant first claims that the evidence presented at trial was legally insufficient to support the conviction of conspiracy to commit murder. Specifically, the defendant argues that because his cooperation alone is insufficient to support the inference of an agreement, there could be no conspiracy. We are not persuaded.

"Our standard of review of sufficiency of evidence claims is well settled. In reviewing a sufficiency of the evidence claim, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In evaluating evidence, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *State* v. *Jackson*, 257 Conn. 198, 204–205, 777 A.2d 591 (2001).

In addition, "[t]here is no distinction between direct and circumstantial evidence so far as probative force is concerned . . . . Indeed, [c]ircumstantial evidence . . . may be more certain, satisfying and persuasive than direct evidence." (Citation omitted; internal quotation marks omitted.) Id., 206. Therefore, "the probative

force of the evidence is not diminished because it consists, in whole or in part, of circumstantial evidence rather than direct evidence." (Internal quotation marks omitted.) *State* v. *Crump*, 43 Conn. App. 252, 256, 683 A.2d 402, cert. denied, 239 Conn. 941, 684 A.2d 712 (1996). "Our inquiry into whether the evidence in the record would support a finding of guilt beyond a reasonable doubt does not require us to ask if we believe that the evidence established guilt beyond a reasonable doubt, but rather if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original; internal quotation marks omitted.) Id.

"To prove the crime of conspiracy, in violation of § 53a-48, the state must establish beyond a reasonable doubt that an agreement existed between two or more persons to engage in conduct constituting a crime and that subsequent to the agreement one of the conspirators performed an overt act in furtherance of the conspiracy." (Internal quotation marks omitted.) *State* v. *Forde*, 52 Conn. App. 159, 167–68, 726 A.2d 132, cert. denied, 248 Conn. 918, 734 A.2d 567 (1999). "The existence of a formal agreement between the parties need not be proved. It is sufficient to show that they are knowingly engaged in a mutual plan to do a forbidden act. . . . Because of the secret nature of a conspiracy, a conviction is usually based on circumstantial evidence. . . . The state need not prove that the defendant and a coconspirator shook hands, whispered in each other's ear, signed papers, or used any magic words such as we have an agreement." (Citations omitted; internal quotation marks omitted.) *State* v. *Crump*, supra, 43 Conn. App. 258.

"Furthermore, [t]he size of a defendant's role does not determine whether that person may be convicted of conspiracy charges. Rather, what is important is whether the defendant willfully participated in the activ-

*ities* of the conspiracy with knowledge of its illegal ends. . . . *Participation in a single act in furtherance of the conspiracy is enough to sustain a finding of knowing participation.*" (Emphasis added; internal quotation marks omitted.) *State* v. *Forde*, supra, 52 Conn. App. 168.

Our review of the record discloses that there was sufficient evidence to allow the jury to conclude that the state proved, beyond a reasonable doubt, that the defendant and Billy conspired to kill the victim. Billy and the defendant were members of allied gangs when they encountered the victim, who was a member of a rival gang. The defendant watched Billy retrieve the gun and begin shooting. It was the defendant who drove the Buick faster to catch up to Girven while Billy continually fired the gun at Girven's car.[4] In addition, Stanley

---

[4] On direct examination, Delcy Dullary, the passenger in the backseat of the Buick during the entire incident, testified in relevant part:

"Q: Where did you get into the [Buick]?

"A: The rear passenger seat.

"Q: Okay. And did you see where [the defendant] got into the car?

"A: Yeah. In the driver's seat.

"Q: And where did Billy get into the car?

"A: Front passenger.

"Q: And what happened after that point?

"A: We went northbound down Chadwick and then Chadwick turn . . . into South Whitney and we got to the light at South Whitney and Capitol Avenue . . . .

"Q: Were you stopped at the light there?

"A: Yeah. And then one of them stated there goes a [rival gang member] right there.

"Q: Do you remember who said that?

"A: To be honest with you, right now I don't remember which one of them said it; it's been a long time. But one of them said there's a [rival gang member] right there.

"Q: And let me interrupt you. As that was said, what did you see?

"A: I seen an—it was a red car at the light on Capitol Avenue facing eastbound with one person inside.

* * *

"Q: And then what happened?

"A: And then Billy pulled out a gun and he took one shot at the car and the car sped off.

Wasilewski and Paul Sherokow, detectives with the Hartford police department, both testified that when they arrested the defendant in Puerto Rico, he admitted that he was driving the Buick. From this evidence, the jury reasonably could have inferred that the defendant and Billy agreed to kill the victim. With Billy as the shooter and the defendant as the driver, the two worked in concert to accomplish this goal. Viewing this evidence in the light most favorable to sustaining the verdict, we conclude that the jury reasonably could have

"Q: Was that at that intersection?

"A: Yes.

\* \* \*

"Q: Then what happened?

"A: And the car took off . . . .

"Q: Which one?

"A: The car that they shot at took off and . . . we proceeded after them, and I asked them to stop and let me out and they just kept going.

\* \* \*

"Q: Who is they?

"A: Billy fired a few times at [the car] and [the defendant] had the car floored going about eighty or ninety, and I was telling them to let me out and stop and they wouldn't. They just told me to shut up and put my seat belt on, because we were going really fast.

"Q: Were there only you three people in the car?

"A: Yes.

"Q: Do you remember where shots were actually fired along Whitney Street?

"A: It was up and down the whole street, a few seconds in between each shot.

"Q: Do you remember a total of how many shots were fired while the cars were moving?

"A: About four or five.

\* \* \*

"Q: . . . [W]hat did you say to them?

"A: Oh. . . . I told them I wasn't in the bullshit, to let me out. And all Billy kept saying was pull up next to the car, pull up next to the car while Billy was shooting at it, and [the defendant] kept driving, saying, I can't, I can't.

\* \* \*

"Q: And how fast do you think the car was going?

"A: At least eighty or ninety. It was floored.

\* \* \*

"Q: How close was the red car?

"A: Probably twenty, thirty feet."

concluded that the evidence established beyond a reasonable doubt that the defendant was guilty of conspiracy to commit murder.

## II

The defendant's remaining arguments focus on the court's charge to the jury. He claims that the court improperly (1) made factual findings in the charge, (2) bolstered the credibility of the state's key witness and (3) informed the jury that he could not offer an alibi defense. We will address each claim in turn.

As a preliminary matter, the defendant concedes that he did not properly preserve these claims for appeal by taking exception to the charge as given. He seeks review under the doctrine set forth in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[5] He argues that based on the improper jury instruction, he was denied due process of law as guaranteed by the fourteenth amendment to the United States constitution and article first, § 8, of the Connecticut constitution.[6] We review the defendant's claims pursuant to *Golding* because an adequate record exists and he alleges a

[5] Under *State* v. *Golding*, supra, 213 Conn. 239–40, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) "In the absence of any one of these conditions, the defendant's claim will fail." Id., 240.

[6] "Because the defendant has not briefed his claim separately under the Connecticut constitution, we limit our review to the United States constitution. We have repeatedly apprised litigants that we will not entertain a state constitutional claim unless the defendant has provided an independent analysis under the particular provisions of the state constitution at issue. . . . Without a separately briefed and analyzed state constitutional claim, we deem abandoned the defendant's claim . . . ." (Internal quotation marks omitted.) *State* v. *Jones*, 65 Conn. App. 649, 652 n.6, 783 A.2d 511 (2001).

constitutional violation. See *State* v. *Parker*, 67 Conn. App. 351, 354, 786 A.2d 1252 (2001). The defendant, however, cannot prevail on any of his claims regarding the jury charge under the third prong of *Golding* because he cannot demonstrate that a constitutional violation clearly exists that clearly deprived him of a fair trial.

"When reviewing [a] challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper. . . . [I]n appeals involving a constitutional question, [the standard is] whether it is reasonably possible that the jury [was] misled." (Citation omitted; internal quotation marks omitted.) *State* v. *Rodriguez*, 63 Conn. App. 529, 534, 777 A.2d 704, cert. denied, 256 Conn. 936, 776 A.2d 1151 (2001). Furthermore, "[u]nder prong three of *Golding*, a challenged jury instruction constitutes a clear constitutional violation that clearly deprives a defendant of a fair trial if it is found reasonably possible that the jury was misled by the court's instruction." (Internal quotation marks omitted.) *State* v. *Orta*, 66 Conn. App. 783, 795, 786 A.2d 504 (2001), cert. denied, 259 Conn. 907, 789 A.2d 997 (2002).

A

The defendant's first claim regarding the jury instructions is that the court improperly made factual findings.

First, he argues that because the court used the word "murder" immediately after "homicide" and without qualification, the court explicitly declared to the jury that the victim's death was a murder.[7] Next he argues that because the court stated that the defendant was in Puerto Rico "shortly" after the murder, the court impermissibly found that the defendant was actually in Connecticut at the time of the murder. We are not persuaded.

First, with regard to the court's use of the word "murder," the defendant argues that *State* v. *Echols*, 170 Conn. 11, 364 A.2d 225 (1975), supports his contention that the court's statement was a judicial affirmation of a critical part of the state's case. This argument is misplaced. In *Echols*, the trial court made an improper

---

[7] The court's instruction to the jury provided in relevant part: "It is up to you as the judges of the facts to decide whether statements or conduct of the defendant reflect consciousness of guilt and to consider such in your deliberations and in accordance with these instructions.

"Now, as stated, flight when unexplained tends to prove consciousness of guilt. The flight of a person accused of a crime is a circumstance, which, when considered together with all the facts of the case, may justify a finding of the defendant's guilt.

"However, as I indicated, flight, if shown, is not conclusive. It is to be given the weight to which you the jury think it is entitled to under all of the circumstances.

"*And, of course, here there was evidence that the defendant left Hartford and went to Puerto Rico—an exact date was not stated. It was shortly after the homicide, murder of James Girven—and remained there until his arrest on these charges some two years and five months later.*

"There was also evidence offered by the defendant who—it was through [the] defendant and his mother—tending to explain his conduct by the defendant, that is, evidence regarding the illness of and subsequent death of the grandmother in Puerto Rico, his caring for the grandmother before her death and his having a girlfriend in Puerto Rico and later having a child by that woman. And, of course, there was the evidence of a driver's license in his own name in Puerto Rico.

"If you find that he was fleeing from this charge or because of this homicide, you may consider that as evidence of his consciousness of guilt. If you find that he was not fleeing as a result of this charge or as a result of the homicide, you should not consider it as evidence of consciousness of guilt." (Emphasis added.)

comment during the cross-examination of one of the state's witnesses. Our Supreme Court concluded that the comment constituted prejudicial error. Id., 16. In the present case, the defendant challenges a single word used by the court during the *jury instructions*. We cannot review the comment by the court in isolation from the remainder of the jury charge as the defendant now argues. See *State* v. *Burton*, 258 Conn. 153, 161, 778 A.2d 955 (2001). Thus, *Echols* is inapposite to the present case. Further, because the issue of whether the shooting of the victim constituted murder was virtually uncontested at trial, the court's statement appropriately diverted the jury's attention from the murder issue to the key issue in the trial, i.e., whether the defendant was the driver of the Buick. The court also did not withdraw from the jury the issue of whether the killing of the victim was murder. The court instructed the jury on the elements of conspiracy to commit murder and told the jury that the state was required to prove beyond a reasonable doubt that the defendant intended to cause the death of the victim. Under these circumstances, we cannot conclude that the court's use of the word "murder" during the jury instructions deprived the defendant of a fair trial. See *State* v. *Collette*, 199 Conn. 308, 318, 507 A.2d 99 (1986).

Next, the defendant argues that the court asserted as a matter of undisputed fact that the defendant left the country "shortly" after the homicide. "A trial court has broad discretion to comment on the evidence adduced in a criminal trial. . . . A trial court often has not only the right, but also the duty to comment on the evidence. . . . The purpose of marshaling the evidence, a more elaborate manner of judicial commentary, is to provide a fair summary of the evidence, and nothing more; to attain that purpose, the [trial] judge must show strict impartiality. . . . To avoid the danger of improper influence on the jury, a recitation of the

evidence should not be so drawn as to direct the attention of the jury too prominently to the facts in the testimony on one side of the case, while sinking out of view, or passing lightly over, portions of the testimony on the other side, which deserve equal attention." (Internal quotation marks omitted.) *State* v. *Dixon*, 62 Conn. App. 643, 647–48, 772 A.2d 166 (2001).

Again, the defendant appears to ask this court to review the court's comments in isolation. This we will not do. During its instruction on flight, as evidence of consciousness of guilt, the court instructed the jury that *there was evidence* that the defendant left Hartford and that it was "shortly after the homicide." See footnote 7. In the very next sentence, the court summarized the defendant's argument that the trip to Puerto Rico was not evidence of his guilt, but he, in fact, went to visit and care for his ailing grandmother.

In addition, there was ample evidence in the record that the defendant was in Hartford at the time of the murder. Dullary identified the defendant as the driver of the Buick. Detectives Wasilewski and Sherokow both testified that the defendant admitted to being the driver of the Buick. Furthermore, the defendant's own testimony does not refute the court's characterization of the timing. The defendant testified that he went to Puerto Rico sometime in July, 1994. He could not remember the specific date. In addition, the defendant's mother testified that he traveled to Puerto Rico with her in mid-July, 1994. The murder occurred on July 13, 1994. The evidence presented by the defendant himself supports the inference that the trip was shortly after the homicide.

In addition to the foregoing, the court instructed the jury that it was the sole judge of the facts, that the jury's own recollection of the evidence must control its factual determinations and that the jury should make

factual determinations independent of the court's determinations. The court also instructed the jury regarding the elements of murder. We conclude, after reviewing the jury instruction, that it is not reasonably possible that the court's commentary misled the jury. Therefore, the defendant cannot prevail on this claim under the third prong of *Golding* because he has failed to establish that a constitutional violation clearly exists and that it clearly deprived him of a fair trial.

B

The defendant next argues that the court improperly bolstered the state's case by crediting as true the testimony of the prosecution's key witness and undermined the defense theory of the case by removing the motive Dullary would have had for lying.[8] We disagree.

It is fundamental that the court cannot vouch for the credibility of the state's witnesses. See *State* v. *Camerone*, 8 Conn. App. 317, 325, 513 A.2d 718 (1986). "The influence of the trial judge on the jury is necessarily and properly of great weight . . . and jurors are ever watchful of the words that fall from him. . . . These admonitions and cautions are prompted by the truism that a jury has a natural tendency to look to the trial judge for guidance, and may find it even where it is not intended." (Citations omitted; internal quotation marks omitted.) Id.

In the present case, there was no evidence in the record that would implicate Dullary in the crime. Dullary testified that he repeatedly asked the defendant to pull over so that he could exit the vehicle because he was not involved in the gang related hostilities. In addition, Dullary testified that he fled in a direction

---

[8] The court's instruction to the jury provided in relevant part: "Mr. Dullary was never arrested regarding this crime, and, as the state pointed out, there was no evidence implicating him in this crime which would have provided any basis for an arrest."

different from that of the defendant and Billy after the shooting. Dullary also testified that the next day the defendant and Billy threatened him if he told anyone what had happened. Moreover, defense counsel argued during his summation that avoiding arrest was Dullary's motive for lying even though there was no evidence in the record that Dullary could be implicated in the crime.[9]

The court's statement that Dullary had never been arrested for Girven's killing and that there was no evidence implicating him in the crime was a proper marshaling of the evidence. Furthermore, the court extensively instructed the jury regarding credibility, including that "[t]he credibility of witnesses and the weight to be given any evidence in the case are matters entirely and exclusively within your province. As stated, you may believe all, none or any part of any witness' testimony." The jury also had before it Dullary's prior convictions and his prior inconsistent statement with which to weigh his credibility. Viewing the jury instruction in its entirety, we conclude that it was not reasonably possible that the court's commentary misled the jury, and, therefore, the defendant's claim fails under the third prong of *Golding*.

C

The defendant's final claim is that the court improperly instructed the jury that he did not and could not

---

[9] We note that defense counsel, in closing argument, cannot rely upon facts not within the record. "While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment upon, or even to suggest an inference from, facts not in evidence, or to present matters which the jury have no right to consider. . . . *State* v. *Pouncey*, 241 Conn. 802, 811, 699 A.2d 901 (1997)." (Internal quotation marks omitted.) *Durso* v. *Aquilino*, 64 Conn. App. 469, 476, 780 A.2d 937 (2001). Furthermore, Dullary was not on trial.

raise an alibi defense.[10] Specifically, the defendant argues that because the court stated that his denial of involvement was not an alibi, his defense was undermined. The state argues that the language at issue does distinguish between an "alibi" defense and the defendant's assertion that he was not present during the crime. Our resolution of this claim turns on our interpretation of the rules of practice governing the notice requirements pertaining to the defense of alibi.

"The rules of statutory construction apply with equal force to Practice Book rules. . . . Where the meaning of a statute [or rule] is plain and unambiguous, the enactment speaks for itself and there is no occasion to construe it. Its unequivocal meaning is not subject to modification by way of construction. . . . A cardinal rule of statutory construction is that where the words of a statute [or rule] are plain and unambiguous the intent of the [drafters] in enacting the statute [or rule] is to be derived from the words used. . . . Where the court is provided with a clearly written rule, it need look no further for interpretive guidance." (Internal quotation marks omitted.) *Krevis* v. *Bridgeport*, 64 Conn. App. 176, 180–81, 779 A.2d 838, cert. granted on other grounds, 258 Conn. 939, 786 A.2d 426 (2001). "Finally, rules of criminal procedure, like penal statutes, are to be strictly construed to protect the fundamental constitutional right to liberty." (Internal quotation marks omitted.) *State* v. *Angell*, 237 Conn. 321, 327, 677 A.2d 912 (1996).

The following provisions of our rules of practice are relevant to our disposition of this claim. Practice Book

---

[10] The court's instruction to the jury provided in relevant part: "You also heard, of course, the testimony of the defendant, and he says that he was not there at all. *He does not assert an alibi defense and could not have done so under the rules, as was pointed out, but he testified that he was not involved at all in the incident, that he was not there.*" (Emphasis added.)

§ 763, now § 40-21,[11] requires the defendant to notify the state in writing of his intention to rely on an *alibi defense*, providing the names and addresses of the witnesses who will testify in support of the alibi defense. Practice Book § 735A, now § 40-5 (4), permits a court to sanction a noncompliant party as it deems appropriate, including "[p]rohibiting the noncomplying party from introducing specified evidence . . . ."

In the present case, the defendant never notified the state of his intention to rely on an alibi defense. The defendant argues, however, that there is nothing in the rules that prevents a defendant who fails to file such notice from asserting during his own testimony that he was not present at the crime scene. Because: § 735A, now § 40-5 (4), permits a court to prohibit "the noncomplying party from introducing specified evidence," it is not clear from the language of the rule whether a court could prohibit a defendant from testifying himself as the defendant did here.

Because the rule does not specifically address whether the court may prohibit a defendant who has failed to satisfy the notice of alibi requirements from testifying that he was not at the scene of the crime, we must ascertain and give effect to the apparent intent of the drafters. "In seeking to discern that intent, we look to the words of the statute [or rule] itself, to the . . . history and circumstances surrounding its enactment, to the . . . policy it was designed to implement, and to its relationship to existing legislation and com-

---

[11] Practice Book § 763, now § 40-21, provides: "Upon written demand filed by the prosecuting authority stating the time, date, and place at which the alleged offense was committed, the defendant shall file within twenty days, or at such other time as the judicial authority may direct, a written notice of the defendant's intention to offer a *defense of alibi*. Such notice by the defendant shall state the specific place or places at which the defendant claims to have been at the time of the alleged offense and the names and addresses of the witnesses upon whom the defendant intends to rely to establish such alibi." (Emphasis added.)

mon law principles governing the same general subject matter." (Internal quotation marks omitted.) *State* v. *Pare*, 253 Conn. 611, 621, 755 A.2d 180 (2000).

Our review of the history of the rules of practice reveals that Practice Book § 735A, now § 40-5, does not limit the right of the defendant to testify in his own behalf. Practice Book § 766 provided: "Upon the failure of either party to comply with the requirements of Sec. 762, the judicial authority may exclude the testimony of any undisclosed witness offered by such party as to the defendant's absence from or presence at the scene of the alleged offense. Sec. 762 shall not limit the right of the defendant to testify in his own behalf." Practice Book § 766 was repealed because it was "unnecessary in light of . . . Sec. 735A [now § 40-5]." See Connecticut Law Journal, Vol. 56, May 9, 1995, p. 57C. We, therefore, conclude that the notice of alibi requirements of Practice Book § 763, now § 40-21, do not apply to a defendant who testifies on his own behalf.

With the foregoing principles in mind, we now address the defendant's claim that the court improperly instructed the jury that he did not and could not assert an alibi defense. There is a clear distinction between an "alibi;" Practice Book § 763, now § 40-21; and "the right of the defendant to testify in his own behalf." Practice Book § 766. The court did not hamper the defendant's ability to testify that he was in Puerto Rico at the time of the murder. By first stating that the defendant testified that he was not there at all, then stating the defendant could not assert an alibi defense *under the rules* and then reiterating that the defendant testified that he was not involved and not there, the court properly instructed the jury regarding the law.

After reviewing the jury instructions in their entirety, we conclude that it is not reasonably possible that the jury was misled. The defendant has failed to establish

that a constitutional violation clearly existed and that it clearly deprived him of a fair trial, and, therefore, he cannot prevail under the third prong of *Golding*.

The judgment is affirmed.

In this opinion the other judges concurred.