920 A.2d 1228 (2007)
392 N.J. Super. 425
STATE of New Jersey, Plaintiff-Respondent,
v.
Darren L. BRADSHAW, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted February 6, 2007.
Decided April 2, 2007.
Amended May 1, 2007.
*1230 Yvonne Smith Segars, Public Defender, for appellant (Alison Perrone, Designated Counsel, on the brief).
Stuart Rabner, Attorney General, for respondent (Jeanne Screen, Deputy Attorney General, of counsel and on the brief).
Appellant filed a pro se supplemental brief.
Before Judges KESTIN, WEISSBARD and LIHOTZ.
The opinion of the court was delivered by
WEISSBARD, J.A.D.
Defendant, Darren Bradshaw, appeals from his conviction following a jury trial on three counts of a nine-count indictment charging the following offenses: first-degree aggravated sexual assault, N.J.S.A. 2C:14-2a(3) (counts one and six); second-degree sexual assault, N.J.S.A. 2C:14-2c(1) (counts two and seven); first-degree kidnapping, N.J.S.A. 2C:13-1b(1) (count three); second-degree robbery, N.J.S.A. 2C:15-1 (counts four and eight); and third-degree terroristic threats, N.J.S.A. 2C:12-3b (counts five and nine).
Counts one through five were severed on defendant's motion and count nine was dismissed prior to trial. After a seven-day trial, defendant was convicted on counts six, seven and eight. With respect to both the aggravated sexual assault and the sexual assault convictions, the jury answered, "yes," in response to a special interrogatory that asked whether the offense was a "violent crime," thus rendering applicable the pre-2001 version of the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. The State moved to have defendant sentenced on his conviction for first-degree aggravated sexual assault, to an extended term as a repeat violent offender, N.J.S.A. 2C:43-7.1b, or as a persistent offender, N.J.S.A. 2C:44-3a. Defendant did not oppose the motion for an extended term. The court granted the State's motion and sentenced defendant on his conviction for first-degree aggravated sexual assault to sixty years with a parole ineligibility term of twenty-five years. On counts seven and eight, second-degree sexual assault and second-degree robbery, the court imposed terms of ten years, to run concurrently with each other and concurrently with the sentence imposed on count six. Additionally, the judge ordered that defendant would be subject to the provisions of Megan's Law, requiring registration as a sex offender, N.J.S.A. 2C:7-2, and imposition of community supervision for life, N.J.S.A. 2C:43-6.4.
Defendant appeals, presenting the following arguments for our consideration:
POINT ONE
THE TRIAL COURT ERRED IN PRECLUDING DEFENDANT FROM TESTIFYING ABOUT HIS ALIBI BECAUSE RULE 3:12 DOES NOT APPLY TO A DEFENDANT'S OWN ALIBI TESTIMONY.

*1231 POINT TWO

EVEN IF RULE 3:12-2 IS APPLICABLE TO A DEFENDANT'S OWN ALIBI TESTIMONY, THE INTEREST OF JUSTICE REQUIRED THAT DEFENDANT BE PERMITTED TO PRESENT HIS ALIBI TESTIMONY.
POINT THREE
THE PROSECUTOR VIOLATED DEFENDANT'S RIGHT TO A FAIR TRIAL BY RELYING ON FACTS NOT PROVEN AT TRIAL AND ON VOUCHING FOR THE CREDIBILITY OF THE VICTIM. (Not Raised Below).
POINT FOUR
THE COURT ABUSED ITS DISCRETION IN IMPOSING A SIXTY-YEAR EXTENDED TERM WITH TWENTY-FIVE YEARS OF PAROLE INELIGIBILITY.
POINT FIVE
IN THE ALTERNATIVE, THIS MATTER MUST BE REMANDED FOR RESENTENCING PURSUANT TO STATE V. NATALE, 184 N.J. 458, 878 A.2d 724 (2005). (Not Raised Below).
We agree with defendant's argument in Point III, requiring reversal and remand for a new trial. We also conclude that while R. 3:12 does apply to defendant's own testimony concerning his whereabouts at the time of the crime, the rule as so applied constitutes an unconstitutional infringement on a defendant's right to present a defense. As a result, we have no need to resolve defendant's sentencing contentions (Points IV and V).[1]

I
Because the jury found defendant guilty, we set out the facts that would have supported such a verdict, largely as set forth in the State's brief. On the night of April 26, 2000, S.D., who is deaf, left her friend's house and was walking home along Eighth Street in Plainfield when she noticed a man on a bicycle behind her. The man, later identified as defendant, was peddling slowly and turning his head to look at S.D. Sensing that "something was wrong," S.D. picked up her pace.
Suddenly, defendant threw down his bicycle, and S.D. began to run. Defendant caught S.D. from behind, jumped on her back and pulled her down to the ground in a grassy area at the edge of the Plainfield High School soccer field. S.D. was momentarily able to get up, but defendant pushed her to the ground again. He held S.D.'s arm on the grass, and pinned her other arm behind her back so that she could not move. Defendant then punched her in the face. S.D. started to scream. S.D. read defendant's lips, and he told her to shut up and threatened to hit her in the face again. Defendant was "very strong" and had S.D. in a "chokehold," with his arm around her neck. Defendant reached inside S.D.'s pants pocket, and then checked the other pocket by feeling the outside of it. Defendant was unsuccessful in finding S.D.'s money, which she kept in her socks.
Defendant then pulled S.D.'s pants down to her thighs, removed his own underwear, and inserted his penis into her vagina. She tried to stop defendant, but could not. S.D. struggled with defendant but he was "very heavy" and it was difficult for her to move at all. S.D. has asthma, and during the struggle she had difficulty breathing. Defendant tried to kiss S.D. on the lips, but she turned her head and refused. Ten to fifteen minutes after he had begun the sexual assault, *1232 defendant got up, said, "I'm sorry," and left on his bicycle.
After defendant left, S.D. got up and "just ran" with her "pants still attached to [her] because [she] was so fearful, [and] was afraid." S.D. ran onto Arlington Avenue, knocked on the doors of two houses, and gestured to the people who answered to call the police. She was crying and used her hands in a praying motion. She put her hands to her face, as if holding a phone, and gestured a siren on top of a vehicle to signify the police. Neither party provided assistance, so S.D. continued running.
At that point, S.D. noticed a police officer driving a patrol car through the area. S.D. waved her arms to stop the officer. The officer, Ronald Fusco of the Plainfield Police Department, testified that at 12:15 a.m., on April 27, 2000, the victim, S.D., had "jumped in front of" his patrol car, "waving her arms," and that he could "see that she was basically hysterical." S.D. "was covered in dirt" and had a cut and a bruise underneath her left eye. Fusco could tell by the way S.D. looked and acted that she most likely had been assaulted. The officer exited his patrol car. S.D. "was hysterical, shaking, crying, [and] very upset." S.D. "was screaming, crying and shaking," as she tried to tell the officer what had happened.
Fusco quickly determined that S.D. was mute, and he gave her his note pad to write down what she was trying to tell him. Through her handwritten notes and hand gestures, S.D. informed Fusco that she had been raped in the soccer field behind Plainfield High School, less than a quarter of a mile from where S.D. had flagged down the officer. S.D. complained of injuries to the mid-portion of her back and her face. She described her assailant as "a black male, five-six, stocky" build, wearing a yellow and green jacket and a black hat, and riding a black mountain bike.
Fusco broadcast the description of the suspect over the police radio and transported S.D. directly to Muhlenberg Hospital. In the emergency room, hospital staff examined S.D. and prepared a rape kit. S.D. trusted Fusco and did not want him to leave, so he remained with her in the emergency room for several hours.
S.D. admitted that she had ingested a bag of heroin on the day of the sexual assault. She had ingested some of it earlier in the day and then ingested the rest between 7:00 and 8:00 p.m. S.D. admitted that she had a significant drug problem at the time, often ingesting three to five bags of heroin per day. In fact, S.D. had a bag of heroin, along with some money in her socks, when she was sexually assaulted. She also ingested a significant amount of heroin on the day she went to the police station to provide the details for a composite sketch of the defendant, and on the day she picked defendant's picture out of the array, as well as at other times when she met with the police. S.D. admitted that heroin affects her memory. However, at the time of trial, S.D. was in a treatment program and claimed to have been free of drugs for a year.
Detective Daniel Passerelli responded to the emergency room, where he was briefed by Fusco and met with S.D. The detective provided hospital personnel with a sealed sexual assault evidence collection kit.
Gary Mouridy, M.D., the emergency room physician who attended to S.D., treated a cut along her left cheekbone under her eye and an abrasion on her left wrist. S.D. complained of back pain. A pelvic examination of the victim revealed the presence of semen in her vagina. Following the procedures of the sexual assault evidence collection kit, the doctor obtained the following from the victim: fingernail scrapings, pubic hair combings, pulled head hairs, vaginal, rectal, and oral swabs *1233 and blood and saliva samples. The nurse collected the victim's underpants, thermal underwear, and outer clothing.
S.D.'s mother picked her up from the emergency room. Passerelli followed them home, and on the way S.D. pointed out the exact location at the high school where the assault had taken place. S.D.'s comb and tissue, which had been in her jacket pocket, were on the ground at that location.
Passerelli returned to headquarters for 6:15 a.m. roll call and advised the officers who were starting the day shift about the sexual assault. The detective provided the officers with a description of the assailant and the geographic area. The police formed a task force to locate the suspect and conducted surveillance in the event that the suspect should re-enter the area.
At 2:00 p.m. on the same day, April 27, 2000, S.D. went to the police station where she assisted an artist in composing a sketch of her assailant. As noted, she was high on heroin at that time. That evening, the police began a surveillance of the area where S.D. was sexually assaulted. According to Passerelli, several officers sat in parked cars throughout the area. Shortly after the surveillance began, Officer Sean McGuire called out over the police radio that he had observed an African-American male who appeared to be following a female down West Eighth Street. Passerelli responded to the area and although he did not see a female, he did see a black male dressed in all black clothing. As Passerelli approached the man in his car, the man jumped through some hedges and tried to hide. Passerelli ordered the man to stop, at which point the man yelled, "You ain't fucking stopping me." As the man started to run, Passerelli's partner tackled him to the ground. Passerelli identified the man as Tyish Kelly and placed him under arrest.
Passerelli subsequently concluded that Kelly did not match the description provided by S.D. and the surveillance was continued the following nights.
On April 30, 2000, at 3:45 a.m., Detective Linda Burroughs spotted a male, later identified as defendant, riding a bicycle in the area of the assault and fitting the description provided by S.D. Burroughs radioed this information to Passerelli, who immediately responded to the area. Passerelli pulled up alongside of defendant, who "bore a striking resemblance" to the composite sketch and who fit the description given by S.D. Passerelli spoke briefly to defendant, who told the officer that he was on his way home and that he had not made any turns off of Eighth Street. When the detective told defendant that he had watched him go around the block, defendant apologized for lying. Passerelli called in a warrant check for defendant, and since there were no outstanding warrants, defendant was permitted to leave.
The next morning, at police headquarters, Detective Caminiti prepared a photo array, which included a photo of defendant. The array was shown to S.D., who selected defendant's photograph and identified him as her attacker. Passerelli sought and obtained warrants for defendant's arrest, a search of his residence, and an order to compel defendant to provide blood and saliva samples for DNA testing.
On May 2, 2000, the police went to defendant's residence to effectuate the warrants. Defendant was placed under arrest and his bicycle and items of clothing were seized. Defendant was administered his Miranda[2] rights, waived them, and gave an oral statement. In his statement, defendant *1234 admitted that he had sexual intercourse with S.D. at the high school field on the night in question, but he claimed that it was consensual and at her behest.
A forensic examination was performed on one of the four vaginal swabs taken from S.D. and it tested positive for the presence of semen, which was also present on the victim's underpants and thermal underwear. Two of the vaginal swabs, a stain from the victim's underwear, and swatches of both the victim's and defendant's blood were sent to Cellmark Labs for DNA analyses.
Cellmark Labs Forensic Laboratory Director Robin Cotton testified as an expert on DNA analysis. Cotton reviewed the testing done by one of her employees and agreed with the employee's conclusion that defendant's DNA matched DNA recovered from the vaginal swabs and from the thermal underwear. Cotton acknowledged that there were gene numbers found in the samples that could not be attributed to either defendant or the victim.
Defendant testified on his own behalf and claimed that he had never met or had sex with S.D. On direct examination, defense counsel asked defendant, "Do you deny the fact that your DNA evidence was allegedly found in the victim?" and defendant answered, "Yes." On cross-examination, defendant denied telling the police in his oral statement that he had had consensual sex with the victim and claimed that he had told police that he did not know S.D.
As noted, based upon the above evidence, defendant was convicted of first-degree aggravated sexual assault, second-degree sexual assault, and second-degree robbery.

II
In his closing argument, the assistant prosecutor said, in pertinent part:
We also lost track that this woman, that good honest woman  and you be a judge of honesty  she came in, talked to you. She didn't exaggerate about anything, not a thing. . . . She came in here bared her soul, everything about her addiction. There's nothing in the police report. Nobody knew about her addiction until she brought it up. You be the judge of the quality of this person, okay. Then think about what happened to her, brutality what happened to her, and she is never going to get over.
I bring up brutality because it is significant. This isn't a passing encounter. This is why she is able to identify the person. This is a man who chased her down, beat her. This is a man who threw her on the ground, got on top of her, his face like this to her face (indicating). This isn't a waiter in the restaurant. As he is going through her pockets, what is he going to do to her, is she going to live? Pulling down the pants, face right there (indicating). He is inside of her, inside of her, face right there (indicating). He is pumping. This man ejaculated inside of her, pumping, the face right there (indicating). He is trying to kiss her. His face right here (indicating). This is an intense experience. With his face right here, he gets up and says "I'm sorry."
This didn't take place in some dark alley. This was an impulsive, freak act right next to the sidewalk, right next to a high school in the middle of the field. The intensity of this moment is huge and the brutality of it is more significant than her ability to  are you surprised she is able to recognize this guy a couple days later when they show her a lineup card after an affront like this, when this person is inside of you ejaculating in you? Are you surprised she had no problem to pick him out? Boom.

*1235 How about the concept that people with handicaps, I don't know, have stronger sensory perception? You heard from when you were a little kid, blind people, they hear things better, better heightened sense of smell. Like blind people can read braille. You and me practice for a week, we couldn't read braille. We couldn't feel, we wouldn't know what it was. These people have magic fingers. How are they able to do it? It is not they are not gifted with it. They are handicapped then work like hell, they work their whole life to communicate. These sensory perceptions, these abilities to feel, that's their thirst to communicate, to have their world open up.
Same thing with [S.D.]. You watched her testifying. You watched her locked-in, how hard it was for her to communicate, just to know what is going on, to express herself. It took two of them to keep going with her. The intensity level for her to communicate, for her to live, for anyone to break into her quiet world, her ability to perceive, her ability to look at someone's face to try to read their mouth to try to see what they are saying. She is a lifelong 40-year-old trained observer. When a person, a deaf person learns how to read  we teach our kids how to read, we get a word, sound it out and we get a little hint. She's never been able to hear anything. She has to look at this, [S.D.], memorized it. She has to be able to observe things. Her whole world is about her ability to recognize things. She recognized this guy. She locked him in. She doesn't know if she is going to live or die. His face right there, inside her. The description she gives is evidence. You don't need anything but [S.D.] in this case.
. . . .
If you all went back in and had to deliberate on the case I just presented to you, you'd come back and find him guilty on [S.D.]'s identification and the strength of her words alone.
Defendant argues that these remarks constituted an improper vouching by the prosecutor for the character and credibility of the victim, and improperly suggested facts to the jury, again touching on the witness's credibility, that were outside the evidentiary record. Defense counsel did not voice an objection to any of the comments, necessitating that we view the issue through the prism of "plain error," R. 2:10-2, which requires that the error be "clearly capable of producing an unjust result."
The principles applying to these claims are well-settled. "A prosecutor may not express a personal belief or opinion as to the truthfulness of his or her witness's testimony." State v. Staples, 263 N.J.Super. 602, 605, 623 A.2d 791 (App. Div.1993), (citing State v. Marshall, 123 N.J. 1, 154, 586 A.2d 85 (1991)). On the other hand, a prosecutor is free to "argue that a witness is credible, so long as the prosecutor does not personally vouch for the witness or refer to matters outside the record as support for the witness's credibility." State v. Walden, 370 N.J.Super. 549, 560, 851 A.2d 758 (App.Div.) (citations omitted), certif. denied, 182 N.J. 148, 862 A.2d 56 (2004). And in that regard, a prosecutor is permitted to respond to defense counsel's arguments. State v. Wilson, 57 N.J. 39, 50, 269 A.2d 153 (1970).
Applied to the prosecutor's statement that the victim was a "good honest woman . . . [an] honorable person . . .," we perceive no reversible error. As the State concedes, while better left unsaid, see State v. Johnson, 125 N.J.Super. 438, 440, 311 A.2d 389 (App.Div.1973), these remarks could be viewed as a fair, albeit *1236 poorly phrased, response to defense counsel's strong attack on the victim's credibility, primarily based on her use of drugs. Shortly after these comments, the prosecutor properly invited the jury to be the judge of whether the victim was telling the truth. "You can judge her character." Thus, the comments did not suggest that the prosecutor possessed information not revealed at trial that the victim was truthful.
Regrettably, the same cannot be said of the prosecutor's exegesis on the heightened sensory perception of people with handicaps, such as deafness. His comments that S.D. was "a lifelong 40-year old trained observer" who, because of her disability "has to be able to observe things" and whose "whole world is about her ability to recognize things," went far beyond the bounds of propriety and could not be deemed a fair response to defense counsel's attack on her credibility. See State v. Johnson, 287 N.J.Super. 247, 266, 670 A.2d 1100 (App.Div.), certif. denied, 144 N.J. 587, 677 A.2d 759 (1996). As noted earlier, it is fundamental that a prosecutor may not "refer to matters outside the record as support for the witness's credibility." State v. Walden, supra, 370 N.J.Super. at 560, 851 A.2d 758. We reject as unfounded the State's contention that "the prosecutor's focus was on the credibility of the victim as manifested by her testimony based on motive and the consistency of her story" and that the comments "in support of the victim's credibility were appropriately based on the victim's demeanor on the witness stand and the concentration that she exhibited while reading lips and testifying with the aid of a sign-language interpreter." Indeed, to the extent that this argument references the "concentration" the victim exhibited while testifying, it is likewise outside the record, as were the comments it seeks to defend.
Nevertheless, the State argues that any error is harmless, emphasizing the strength of the State's case. It is true that the State's evidence was strong, but only insofar as it rested on the DNA results and defendant's claimed confession to having had consensual relations with the victim. Indeed, without either of these items of proof, the case rested solely on the victim's credibility, which was subjected to legitimate attack. In fact, despite the DNA and "confession," the prosecutor himself argued to the jury that, "You don't need anything but [the victim] in this case." Concerning the DNA, there was some evidence that the samples of semen analyzed were contaminated, leading to an extensive argument by defense counsel in summation that there were grounds for the DNA evidence to be rejected by the jury. Further, it cannot be discounted that defendant took the stand and, despite a series of prior convictions, denied committing the offense and denied telling the police that he engaged in consensual sex with the victim. We have no way of knowing whether the jury rejected the DNA evidence and convicted defendant based on the victim's testimony of a forcible assault, rather than consensual sex as argued by defense counsel (contrary to defendant's own testimony). The point is that the case may well have turned on the victim's credibility versus that of defendant, and the remarks we consider to be erroneous could well be said to have affected the balance in the jury's assessment. State v. Pillar, 359 N.J.Super. 249, 279, 820 A.2d 1 (App.Div.), certif. denied, 177 N.J. 572, 832 A.2d 322 (2003). We are not at liberty to reject defendant's testimony any more than we are to reject the victim's testimony.
It is true that defense counsel did not object. It is a mystery why he did not do so, although an explanation comes readily to mind. An objection to these comments *1237 concerning the victim's disability may well have been perceived as insensitive, indeed callous, by the jury. The nature of the remarks put defense counsel "in a box" of the prosecutor's creation. Nevertheless, while this may explain why counsel did not interrupt the prosecutor's summation, we cannot as readily explain why counsel did not at some later time make a record of his objection, if in fact he deemed the statements objectionable.
In any event, it is our function to canvass the record to determine if any error is "plain" or is harmless. The lack of a contemporaneous objection does not obviate a finding of reversible error. State v. Goode, 278 N.J.Super. 85, 92, 650 A.2d 393 (App.Div.1994). Having conducted our review, we conclude that the prosecutor's unfounded comments in summation were "clearly capable of producing an unjust result," R. 2:10-2, and were not harmless. State v. Bankston, 63 N.J. 263, 273, 307 A.2d 65 (1973). The court's general instructions that counsel's comments in summation did not constitute evidence and that the jury was the sole judge of credibility, did not cure the error.

III
Defendant argues that the notice of alibi rule, R. 3:12-2, is unconstitutional insofar as it applies to his own testimony concerning his whereabouts at the time of the crime. Alternatively, he argues that even if the rule is constitutionally applied to his own testimony, in the present case the interests of justice demanded that his testimony be allowed. We agree with defendant's constitutional argument.
The issue arose in the following manner. At the conclusion of the State's case, defense counsel, responding to the judge's inquiry as to "what [defendant's] testimony is going to be," informed the court that defendant would testify, "He is not the person." The judge further asked if the defendant was going to raise the issue of consent, which he had claimed in his post-arrest statement to the police. Defense counsel stated that he had advised defendant that if he did raise consent, the door would be opened to testimony from another woman who also claimed to have been raped by defendant. With counsel's consent, the judge made inquiry of defendant concerning his intention to raise consent and defendant assured the judge that he would not do so. At the same time, the judge asked defendant if he was "going to say [he had] an alibi," to which defendant answered, "Maybe, yes." Asked whether he was going to "say [he was] somewhere else at the time," defendant responded in the affirmative. The judge then continued, asking defendant where he was going to say he was. At that point counsel objected but the judge persisted, seeing "nothing wrong under these circumstances to get a proffer as to what the witness is going to say. . . ." The judge noted that he was "not asking [defendant] anything that shouldn't have been in the alibi notice." The judge continued to insist on such a proffer, and when counsel declined, the judge ordered him to provide the information. If counsel refused, the judge stated that he would have defendant testify outside the presence of the jury. A contentious colloquy followed, with counsel continuing to refuse and the judge threatening to hold him in contempt.
Eventually, the judge simply stated that if defendant "in any way infers an alibi, meaning that he was somewhere else at the time of this rape, alleged rape, I will strike that in front of the jury." The judge made clear that he interpreted the alibi rule to apply to defendant's own testimony, not just that of other witnesses.
After conferring with defendant, counsel then made the desired proffer, that defendant *1238 would testify "he was home that night," "home" being the basement of a one-family house where defendant's family lived. Defendant would testify he was "by himself." When the judge began to inquire whether there were other people "home upstairs" at the time, counsel indicated that such evidence would make counsel a witness since he had interviewed other family members as part of his trial preparation. There followed a lengthy colloquy in which the possibility of a mistrial or a continuance was explored, including the difficulty facing the State in attempting to investigate a matter that was more than two years old. Although the prosecutor ultimately requested that a decision be deferred until defendant testified, so that the State might decide what investigation was needed in light of "what [defendant] says," the judge rejected that approach and ruled as follows:
I'm going to preclude any alibi testimony. State v. Francis, 128 N.J.Super. 346, 320 A.2d 173 [(App.Div.1974)], states that this rule is invocable to preclude the defendant himself from testifying as to an alibi. There has been no alibi notice given here. Notice was given about 20 minutes ago, which is approximately two years late. Nobody contests that. I'm going to preclude his testimony based on State v. Woodard, 102 N.J.Super. 419, 426 to 427, 246 A.2d 130 [(App.Div.), certif. denied, 53 N.J. 64, 247 A.2d 887 (1968)], which says that the court has the power to refuse to allow an unannounced defense alibi witness to testify, particularly with respect to continuation of the trial to investigate the witness and this information would be impractical. We are now in the second week of a trial. It is not practical at this point in time with this limited proffer as to what the testimony would be. I find that the State would be prejudiced and there is no way to cure that prejudice. It is, first of all, two years after the fact. I mean there's no way you are going to be able to remedy that passage of time with people's memories as to who was in a particular house at a particular time.
[Defense counsel] has said there's at least one potential witness, Mr. Bradshaw's sister, who has been difficult to get, at least as far as he is concerned. I think also reading between the lines there is some interpretation that what she would say would be not helpful to the defense and may cause [defense counsel] to be a witness. Although, I'm not sure how that really plays out, and I'm not sure I agree with that. But nevertheless, this investigation can take days or weeks. And then there's the prejudice about the passage of time.
Based on all of that, I am going to preclude any testimony as to alibi.
As noted earlier, defendant adhered to the court's determination and did not seek to present any alibi testimony.
At the outset, we must acknowledge that the issue has been addressed in two of our prior decisions, which reached conclusions contrary to that reached here.[3] In State v. Francis, 128 N.J.Super. 346, 320 A.2d 173 (App.Div.1974), relied upon by the judge in this case,[4] the trial court *1239 precluded the defendant from testifying to his whereabouts at the time of the offense, although he was permitted to testify that he was not present at the scene. Id. at 349, 320 A.2d 173.
On appeal, defendant abandoned his argument that the notice of alibi rule "does not permit or contemplate the exclusion of a defendant's own alibi testimony as a sanction for noncompliance," but only argued that the trial judge abused his discretion in barring defendant's own testimony "as to his whereabouts at the time of the shooting." Id. at 351, 320 A.2d 173. Although concluding that the trial judge "should have done more to explore and to resolve the question" of prejudice to the State by virtue of defendant's noncompliance and whether any perceived "disadvantage might have been redressed by a reasonable continuance," ibid., the court declined to find reversible error under the circumstances. Id. at 351-52, 320 A.2d 173. While it is true that the court's observation on the applicability and validity of the rule as applied to a defendant's own testimony could be viewed as dictum, since, as noted, defendant had abandoned that argument on appeal, we cannot ignore the court's clear statement that it disagreed with the argument that the exclusion of a defendant's own testimony was impermissible as a sanction, particularly in light of its citation of cases throughout the country supporting and opposing such exclusion. Id. at 351, 320 A.2d 173.
In any event, the issue arose again, and was squarely decided, in State v. Gonzalez, 223 N.J.Super. 377, 383-91, 538 A.2d 1261 (App.Div.), certif. denied, 111 N.J. 589, 546 A.2d 514 (1988). There, the defendant's partial testimony that he "was home in New York" at the time of the robbery was stricken by the trial judge, on the State's application, due to noncompliance with the alibi rule. Id. at 382-83, 538 A.2d 1261. The court adopted what it referred to as the "balancing test" set out in Francis, as a method of testing whether preclusion was an appropriate exercise of discretion under the rule. Id. at 385-89, 538 A.2d 1261. However, in focusing on the balancing test, the court specifically rejected defendant's argument that preclusion constituted "an unconstitutional deprivation of his right to testify," id. at 383, 538 A.2d 1261, and referred to cases on both sides of that issue. Id. at 389-90, 538 A.2d 1261. Thus, there is no doubt that the constitutional argument advanced here has been previously rejected by this court at least once, if not twice. It remains to be seen, however, whether that determination has withstood the test of time.
As the courts noted in both Francis and Gonzalez, other jurisdictions have split on this issue. In Alicea v. Gagnon, 675 F.2d 913 (7th Cir.1982), the Court of Appeals, on habeas corpus review, held that the application of the Wisconsin notice-of-alibi statute to preclude a defendant's own testimony of his whereabouts violated the defendant's "constitutional right to testify and to present a defense. . . ." Id. at 925. At the outset, the court confronted the question of whether an accused had a constitutional right to testify in his own behalf since that question had never been expressly addressed by the Supreme Court. Id. at 920. After reviewing the recent Supreme Court cases in which were found statements by various justices strongly suggestive of such a right, as well as other federal and state cases to the same effect, id. at 920-21, the court concluded "that a criminal defendant has a constitutional right to testify in his own behalf under the fifth, sixth, and fourteenth amendments." Id. at 923. In so holding, the court overruled prior Seventh Circuit case law to the contrary. Id. at 922-23.
*1240 At this point in time, twenty-five years after Alicea was decided, we need not pause to reexamine this fundamental premise nor do we need to rely upon Alicea to confirm such a right. In Taylor v. Illinois, 484 U.S. 400, 408-09, 108 S.Ct. 646, 652-53, 98 L.Ed.2d 798, 810-811 (1988), the Supreme Court unambiguously held that an accused's "right to offer testimony is . . . grounded in the Sixth Amendment even though it is not expressly described in so many words." In so holding, the Court relied on Washington v. Texas, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019, 1023 (1967), for the proposition that the right of a criminal defendant "to present his own witnesses to establish a defense . . . is a fundamental element of due process of law." See also Rock v. Arkansas, 483 U.S. 44, 49-53, 107 S.Ct. 2704, 2707-10, 97 L.Ed.2d 37, 44-47 (1987). Consistent with these decisions, our Supreme Court has recognized a defendant's right to testify emanating from our State Constitution. See State v. Savage, 120 N.J. 594, 626-28, 577 A.2d 455 (1990).
"Having established [Alicea's] constitutional right to testify in his own behalf," the Alicea court went on to "consider whether the procedural limitations upon that right under Wisconsin's alibi-notice statute are constitutionally permissible." 675 F.2d at 923. The court drew the proper framework for its analyses from its own earlier case of McMorris v. Israel, 643 F.2d 458, 460-61 (7th Cir.1981), cert. denied, 455 U.S. 967, 102 S.Ct. 1479, 71 L.Ed.2d 684 (1982), which it quoted as follows:
Every state is generally free to exercise its sovereign prerogative as to the evidence it will admit in its courts. The federal constitution, however, imposes a limited restraint upon state evidentiary rules where exculpatory evidence is excluded by arbitrary state rules. Washington v. Texas, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). The genesis of this restriction is found in the defendant's sixth amendment right to "compulsory process for obtaining witnesses in his favor." The Constitution imposes this limitation because the state may not deny an accused in a criminal trial the right to a fair opportunity to defend against the state's accusations. Chambers v. Mississippi, 410 U.S. 284, 294, 93 S.Ct. 1038, 1045, 35 L.Ed.2d 297 (1973). However, "the right of a defendant to present relevant and competent evidence is not absolute and (may) `bow to accommodate other legitimate interests in the criminal trial process,'" Hughes v. Mathews, 576 F.2d 1250, 1258 (7th Cir.), cert. dismissed, 439 U.S. 801, 99 S.Ct. 43, 58 L.Ed.2d 94 (1978) (citing Chambers, 410 U.S. at 295, 93 S.Ct. at 1045, [35 L.Ed.2d at 308]), although the competing state interests must be substantial to overcome the claims of the defendant.
[Alicea, supra, 675 F.2d at 923.]
The Alicea court then continued:
In balancing the competing interests underlying Wisconsin's alibi-notice rule and the constitutional policies favoring petitioner's right to testify, we must closely examine the justification for the state interest. See Chambers v. Mississippi, 410 U.S. at 295, 93 S.Ct. at 1045, [35 L.Ed.2d at 308]; Hughes v. Mathews, 576 F.2d at 1258. To be sure, Wisconsin has a legitimate interest in preventing the truly guilty from escaping justice by means of fabricated alibis. But we cannot see how that interest is promoted by precluding a defendant's testimony for failure to give notice. The principal reason for notice rules, as we noted at the outset of this opinion, is prevention of surprise to the state, not punishment of the accused for mere technical errors or omissions. In this *1241 situation it is difficult to see how the government can claim surprise. As an essential part of its case, the state must prove a defendant's presence during the commission of an alleged crime, proof which invariably requires pretrial investigation and preparation. Armed with this evidence, the state is in a formidable position to refute a defendant's unexpected alibi testimony, particularly where, as here, such testimony is uncorroborated by other defense witnesses. We doubt that a defendant's unsupported explanation will overcome testimony by state witnesses placing him at the scene of the crime. Thus, the prejudice to the state's case from allowing a defendant to exercise his constitutional right to testify is de minimis and does not warrant complete preclusion.
In addition, we do not consider Wisconsin's interest in facilitating the orderly administration of justice sufficiently important to override the accused's right to tell his version of the story. If a defendant takes the stand and denies his presence during the crime, the state can readily rebut his denial on cross-examination by asking the defendant to address the state's evidence. If for some reason the state considers its evidence significantly weakened by a defendant's unsubstantiated testimony, it should seek a continuance for further investigation, rather than seeking total preclusion of the defendant's testimony. It is unlikely, however, that such defense testimony would ever have enough impact to necessitate a continuance unless the defendant's explanation was so persuasive that his innocence became apparent, in which case the proper measure would be to end the trial, not continue it.[5]
[Id. at 923-24.]
While recognizing that there might be "situations where preclusion is a necessary sanction, such as a defendant's intentional suppression of alibi evidence to gain tactical advantage" the Court did not find that to be so in the case before it. Id. at 925. As a result, "[t]o exact so great a price to further a rule which serves little or no purpose in this context is both illogical and impermissible." Ibid. We agree with that analysis and conclusion and respectfully decline to follow the contrary rulings in Francis[6] and Gonzalez. Accord, Walker v. Hood, 679 F.Supp. 372, 381 (S.D.N.Y.1988) (adopting the "persuasive" reasoning of Alicea); People v. Hampton, 696 P.2d 765, 775-76 (Colo.1985); State v. Fechter, 397 N.W.2d 711 (Ia.1986); contra Rider v. Crouse, 357 F.2d 317 (10th Cir.1966); State v. Charbonneau, 281 Ga. 46, 635 S.E.2d 759 (2006);[7]Kansas v. Rider, 194 Kan. 398, 399 P.2d 564 (1965); Missouri v. Wooten, 735 S.W.2d 30 (Mo.App.1987); State ex rel. Simos v. Burke, 41 Wis.2d 129, 163 N.W.2d 177 (1968).[8]
We do not gainsay the significance of a notice of alibi rule and the opportunity it provides to the State to investigate and refute an alibi defense. However, the *1242 State always faces the potential that a defendant will, in the course of his own testimony, come up with facts that are a "surprise" to the State. That possibility exists so long as a defendant is not required to provide an advance statement of his testimony. In any event, for the reasons set out by Judge Bauer in Alicea, the central and unique position occupied by the defendant in a criminal trial is such that his testimony on the critical issue of his whereabouts at the time of the crime cannot be forfeited without doing substantial damage to, and thereby undermining, his constitutional right to testify in his own defense. Our holding extends no further than to defendant's own testimony and does not extend to other witnesses.
While we have discussed this issue largely in terms of the federal Constitution,[9] we also conclude that our State Constitution compels the same result. As we have noted, a defendant's right to testify has been found implicit in the due process and compulsory process guarantees of our State Constitution, Savage, supra, 120 N.J. at 594, 577 A.2d 455, the same guarantees from which that right has been found to emanate in the federal sphere. As such, the notice of alibi rule, as applied to defendant's own testimony, runs afoul of our State Constitution as well. See State v. Muhammad, 145 N.J. 23, 41, 678 A.2d 164 (1996).
Finally, even if we were not reversing because of the prosecutor's summation, we would not find the exclusion of defendant's testimony as to his whereabouts to be harmless error. Alicea, supra, 675 F.2d at 925-26. At its heart, this was a one-witness identification case. We have yet to elevate DNA evidence to the status of a talisman that obviates all other trial errors. While highly persuasive, DNA evidence is not "conclusive," as the State argues, where flaws may exist in the sample selection or testing process, as may have occurred here. As we noted earlier, there was some basis to reject the DNA evidence here and defense counsel attacked that proof at length in summation. Even in the face of DNA evidence, defendant's
defense largely consisted of his assertions that he was not the perpetrator of the crimes and that the victim was mistaken in her identification. Depriving him of the opportunity to testify as to his whereabouts at the time of the crimes cut at the heart of the jury determination of these crucial matters and prejudiced appellant's substantial rights.
[Campbell v. State, 622 N.E.2d 495, 499 (Ind.1993).]

IV
Because of the assistant prosecutor's improper and prejudicial summation comments and the exclusion of his alibi testimony, defendant did not receive a fair trial.
Reversed and remanded for a new trial.
NOTES
[1] Defendant's pro se supplemental brief deals only with his sentence.
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[3] A related issue was addressed in State v. Angeleri, 51 N.J. 382, 241 A.2d 3 (1968), cert. denied, 393 U.S. 951, 89 S.Ct. 372, 21 L.Ed.2d 362 (1968), where the Court rejected a Fifth Amendment challenge to the alibi rule, presaging a similar determination by the United States Supreme court two years later, Williams v. Florida, 399 U.S. 78, 80-86, 90 S.Ct. 1893, 1895-1898, 26 L.Ed.2d 446, 449-52 (1970), over the dissent of Justices Black and Douglas. Id. at 108-116, 90 S.Ct. at 1910-1914, 26 L.Ed.2d at 480-85.
[4] We cannot fault the judge for relying on a binding decision from this court.
[5] The correctness of the courts balancing analysis was confirmed in Rock v. Arkansas, supra, 483 U.S. at 55-56, 107 S.Ct. at 2711, 97 L.Ed.2d at 48-49.
[6] We note that the Francis panel did not have the benefit of Alicea which was decided over eight years later. The same cannot be said of Gonzalez, which referenced Alicea as contrary authority.
[7] Two justices dissented.
[8] Some courts have concluded that the specific language of their notice of alibi rules do not permit exclusion of defendant's own testimony. Louisiana v. Alexander, 904 So.2d 855, 860 (La.App.2005); People v. Peace, 256 A.D.2d 1014, 683 N.Y.S.2d 317, 318 (1998); State v. Gonzalez, 69 Conn.App. 649, 796 A.2d 1225, 1236-37 (2002)
[9] We reject the State's assertion that Rock v. Arkansas, supra, established that "a criminal defendant has no right to testify in defiance of notice requirements." Rock did not deal with a notice of alibi rule but with the exclusion of a defendant's hypnotically refreshed testimony.